# IN THE SUPREME COURT OF CALIFORNIA

BRETT VORIS,
Plaintiff and Appellant,

v.

GREG LAMPERT,
Defendant and Respondent.

S241812

Second Appellate District, Division Three
B265747

Los Angeles County Superior Court
BC408562

August 15, 2019

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, and Groban concurred.

Justice Cuéllar filed a dissenting opinion, in which Justice Liu concurred.

VORIS v. LAMPERT

S241812


Opinion of the Court by Kruger, J.


For a little more than a year, Brett Voris worked alongside Greg Lampert to launch three start-up ventures, partly in return for a promise of later payment of wages. But after a falling out, Voris was fired and the promised compensation never materialized. Voris sued the companies and won, successfully invoking both contract-based and statutory remedies for the nonpayment of wages. He now seeks to hold Lampert personally responsible for the unpaid wages on a theory of common law conversion. Voris claims that by failing to pay the wages, the companies converted his personal property to their own use and that Lampert is individually liable for the companies' misconduct. The question before us is whether such a conversion claim is cognizable. We conclude it is not: The conversion tort is not the right fit for the wrong that Voris alleges, nor is it the right fix for the deficiencies Voris perceives in the existing system of remedies for wage nonpayment. We affirm the judgment of the Court of Appeal, which reached a similar conclusion.

**I.**

In November 2005, Voris joined Lampert and a friend, Ryan Bristol, to launch a real estate investment company called

Premier Ten Thirty One Capital (PropPoint).[1]  Voris performed marketing and advertising work for PropPoint and was later recruited to do similar work for two other ventures formed by Lampert and Bristol:  Liquiddium Capital Partners, LLC (Liquiddium) and Sportfolio, Inc. (Sportfolio).  Voris worked for all three companies in exchange for promises of later payment of wages, stock, or both.  He also invested significant sums of money in PropPoint and Liquiddium in exchange for additional equity.

In the fall of 2006, Voris discovered what he believed to be improprieties in his colleagues' management of the companies' finances.  He raised his concerns with Lampert and Bristol.  In early 2007, after a series of contentious negotiations, Voris's employment with all three companies was terminated.  Save for a portion of compensation paid by PropPoint during his employment, Voris was never paid the wages or stock he was owed.

Voris sued the three companies, as well as Bristol and Lampert.  The operative complaint raised 24 causes of action, including breach of oral contract, quantum meruit, fraud, failure to pay wages in violation of the Labor Code, conversion, breach of the implied covenant of good faith, and breach of fiduciary duty.  Voris sought $91,000 in unpaid wages from PropPoint, $66,000 in unpaid wages from Sportfolio, and various percentages of equity in all three companies.  He also sought to

---

[1]  This case comes to us following the grant of judgment on the pleadings, so we accept as true all material facts alleged in the operative complaint.  (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 (*Angelucci*).)

hold Lampert and Bristol personally liable on all counts based on a theory of alter ego liability.

Voris prevailed against all three companies. His claims against Sportfolio and Liquiddium were tried to a jury.[2] The jury found in Voris's favor on the claims against Sportfolio for breach of contract, failure to pay wages, failure to pay for services rendered, and conversion of stock. The jury awarded $70,782 in damages. The jury also found in Voris's favor against Liquiddium on the claims for breach of contract and conversion of stock. The jury awarded $100,218, including an award of $2,500 in punitive damages on the stock conversion claim. Voris's claims against PropPoint proceeded to a bench trial. PropPoint did not enter an appearance, and the court ruled in Voris's favor on the claims for breach of contract, quantum meruit, failure to pay wages in violation of the Labor Code, and conversion of stock and wages. The court awarded Voris $171,951 in damages, plus prejudgment interest, costs, and attorney fees.

Although Voris prevailed against all three companies, he alleges that his efforts to collect on the judgments have been frustrated due to the companies' lack of funds and assets. Voris has therefore now focused his efforts on Lampert, the remaining individual defendant.

At the outset of the litigation, Lampert had successfully demurred to the claims of fraud and breach of the implied covenant of good faith. He then filed a motion for summary judgment on the remaining claims, citing Voris's barebones responses to special interrogatories pertaining to the alter ego

---

[2]     Bristol was also a defendant in the jury trial, but he successfully moved for nonsuit.

allegations. The trial court agreed that Voris failed to adequately support his claims of alter ego liability and granted Lampert's motion for summary judgment. In an unpublished decision, the Court of Appeal affirmed in part and reversed in part. It upheld the trial court's ruling on Voris's alter ego allegations based on his failure to identify supporting facts. But the Court of Appeal nevertheless reversed the trial court's grant of summary judgment with respect to Voris's conversion claims, explaining that individual officers may be held personally liable for their intentional torts "without any need to pierce the corporate veil."

On remand before the trial court, Lampert moved for judgment on the pleadings on the stock and wage conversion claims. He argued that Voris failed to allege a sufficient deprivation of ownership interests in the stocks and that California law does not recognize a claim for the conversion of wages. The court granted the motions, and Voris again appealed.

In a second unpublished decision, the Court of Appeal once again affirmed the trial court in part and reversed in part. All three justices agreed that Voris's stock conversion claims should be permitted to proceed; they relied for this ruling on a " ' "uniform rule of law that shares of stock in a company are subject to an action in conversion." ' "[3] But the justices were

---

[3] No party has challenged the Court of Appeal's ruling that Voris pleaded a proper claim for stock conversion, so we do not address that ruling here. To the extent the dissent suggests we have expressed an opinion on the stock conversion issue (see dis. opn., *post*, at pp. 2, 10–11, 13), it is simply mistaken. The dissent is therefore also mistaken in suggesting that any

divided on whether Voris had pleaded a cognizable claim for conversion of wages—a claim that had not been previously recognized in California precedent.[4]  The majority concluded that neither existing case law nor policy considerations warranted extending the tort of conversion to the wage context. The majority observed that the Labor Code already requires prompt payment of a discharged employee (Lab. Code, § 201) and authorizes penalties for noncompliance (*id.*, § 203).  "[I]f Voris's approach were credited," the Court of Appeal reasoned, "any claimed wage and hour violation would give rise to tort liability for conversion as well as the potential for punitive damages."  The concurring and dissenting justice took a

_____

distinction, or lack thereof, between unpaid stock shares and unpaid wages is "fundamental to [our] conclusion" in this case. (*Id.* at p. 10.)

[4]    Although the Court of Appeal in this case was the first California appellate court to address the viability of a claim for the conversion of earned but unpaid wages, several federal district courts have attempted to predict how we would decide the issue, and they have reached divergent conclusions. (Compare *Sims v. AT & T Mobility Services LLC* (E.D.Cal. 2013) 955 F.Supp.2d 1110, 1118–1120 [recognizing conversion claim for unpaid wages under California law]; *Rodriguez v. Cleansource, Inc.* (S.D.Cal. Aug. 20, 2015, No. 14-cv-0789-L (DHB)) 2015 WL 5007815, at *9 [same]; *Alvarenga v. Carlson Wagonlit Travel, Inc.* (E.D.Cal. Feb. 8, 2016, No. 1:15–cv-01560-AWI-BAM) 2016 WL 466132, at *4 [same] with *Jacobs v. Genesco, Inc.* (E.D.Cal. Sept. 3, 2008, No. CIV. S-08-1666 FCD DAD) 2008 WL 7836412 [rejecting wage conversion claim under California law]; *In re Wal-Mart Stores, Inc. Wage and Hour Lit.* (N.D.Cal. 2007) 505 F.Supp.2d 609, 619 [same]; *Vasquez v. Coast Valley Roofing Inc.* (E.D.Cal. June 6, 2007, No. CV-F-07-227 OWW/DLB) 2007 WL 1660972, at *10 [same].)

different view. He opined that "employees have a vested property interest in their earned wages, that failure to pay them is a legal wrong that interferes with this property interest, and that an action for conversion may therefore be brought to recover unpaid wages."

We granted review to address this disagreement. Our review is de novo. (*Angelucci, supra*, 41 Cal.4th at p. 166.)[5]

## II.

To place the question before us in its proper context, we begin with a brief overview of existing law governing the payment of workers' wages. The employment relationship, we

---

[5] Voris requests that we take judicial notice of four newspaper articles, a criminal indictment mentioned in two of those articles, and a study published by the National Employment Law Project. We deny Voris's requests for judicial notice. The four news articles that he asks us to notice are not proper authorities to establish the truth of the matters asserted therein. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6 ["The truth of the content of the articles is not a proper matter for judicial notice, and the circumstance that the articles were published is irrelevant to our discussion."].) Although we have discretion to take judicial notice of the criminal indictment as a court record (Evid. Code, §§ 452, subd. (d), 459), we deny Voris's request; the truth of the matters alleged in the indictment is not the proper subject of judicial notice, and the existence of the indictment alone is irrelevant to our decision (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063–1064; *Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 145). As for the study that Voris cites, we need not take separate judicial notice of it, because it is already cited and discussed in the legislative history of Senate Bill No. 588, which we have properly noticed at footnote 15. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [court can take judicial notice of published legislative history].)

have explained, is "fundamentally contractual," meaning it is governed in the first instance by the mutual promises made between employer and employee. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 696 (*Foley*); see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352.) The promise to pay money in return for services rendered lies at the heart of this relationship. Historically, when that promise has been broken, the "usual remedy" has been an action for breach of contract. (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 343, citing *Elevator Operators etc. Union v. Newman* (1947) 30 Cal.2d 799, 808, and cases cited therein.) Even in the absence of an explicit promise for payment, the law will imply one, and thus authorize recovery, when circumstances indicate that the parties understood the employee was not volunteering his or her services free of charge. (E.g., *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458 [describing principle of quantum meruit].)

Beginning more than a century ago, the Legislature began to supplement existing contract remedies with additional worker protections designed to "safeguard" the worker "in his relations to his employer in respect of hours of labor and the compensation to be paid for his labor." (*Moore v. Indian Spring etc. Min. Co.* (1918) 37 Cal.App. 370, 379 (*Indian Spring*); see *In re Ballestra* (1916) 173 Cal. 657 (*Ballestra*).) The end product is what we have described as "a mass of legislation touching upon almost every aspect of the employer-employee relationship." (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178.) As relevant here, the Legislature has repeatedly acted to ensure employees receive prompt and full compensation for their labor. Recognizing that the problem of wage nonpayment can take a number of forms, the Legislature has responded with a variety

of targeted legislative solutions. (See, e.g., *In re Trombley* (1948) 31 Cal.2d 801, 809–810 (*Trombley*) [criminal penalties for willful failure to timely pay wages due]; *Ballestra*, at pp. 658–659 [statutory prohibition on payment of wages using nonnegotiable instruments]; *Reid v. Overland Machined Products* (1961) 55 Cal.2d 203 [statutory ban on withholding wages as a condition of settling wage disputes].) Underlying each of these enactments has been the recognition that prompt and complete wage payments are of critical importance to the well-being of workers, their families, and the public at large. (E.g., *Trombley*, at pp. 809–810.)

Voris relied on existing contract and statutory remedies in obtaining judgments against his three former employers. But he claims he has been unable to collect on the judgments because Lampert deliberately ran down the companies' accounts and "managed the employer startups into insolvency." To ensure effective relief, Voris asks us to supplement the existing remedial scheme with a common law cause of action for conversion of unpaid wages. Although the obligation to pay wages belongs to the employer (here, the three start-up companies), Voris further asks us to recognize a claim against individual officers who have either directed or participated in the employer's failure to pay. (See *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504 (*Frances T.*).) Putting these two pieces together, Voris seeks to hold Lampert personally liable, in tort, for withholding the money Voris is owed.

## III.

As Voris acknowledges, no precedential decision of any California court to date has authorized a conversion claim based on the nonpayment of wages.[6]  Given how often the problem

---

[6]  Voris points to a handful of other jurisdictions that have mentioned such a remedy, but we have found no reasoned state or federal precedential decision holding that a cause of action for conversion will lie based on the ordinary nonpayment of wages.

Many of the jurisdictions that have recognized conversion claims involving wages have done so in meaningfully different contexts, for instance where an employee's wages were garnished or assigned to a third party. (E.g., *McGown v. Silverman & Borenstein, PLLC* (D.Del. Feb. 7, 2014, No. 13-cv-748-RGA/MPT) 2014 WL 545903 [applying New Jersey law and upholding conversion claim against collection agency for improperly garnishing employee's wages]; *Jordet v. Jordet* (N.D. 2015) 861 N.W.2d 147 [upholding conversion claim against spouse for wages improperly garnished for spousal support]; *Giles v. General Motors Corp.* (2003) 344 Ill.App.3d 1191 [upholding conversion claim for wages withheld by employer purportedly pursuant to court order for spousal support]; *Bell Finance Co. v. Johnson* (1935) 180 Ga. 567 [upholding conversion claim against employee for failure to transfer wages assigned by employee to third party].)

The jurisdictions that have mentioned the conversion of wages in more comparable contexts have done so with little meaningful analysis. (E.g., *Ocean Club Community Assn., Inc. v. Curtis* (Fla.Dist.Ct.App. 2006) 935 So.2d 513 [applying Florida law and primarily discussing attorney fees in the context of a successful claim for the conversion of unpaid wages]; *Cork v. Applebee's, Inc.* (2000) 239 Mich.App. 311, 317 [mentioning conversion claim related to wages]; *Dempsey Brothers Dairies, Inc. v. Blalock* (1984) 173 Ga.App. 7, 8 [analyzing the federal Fair Labor Standards Act and concluding

occurs, the lack of authority for a conversion remedy is notable.[7] It is also unsurprising, for the failure to pay wages does not fit easily with the traditional understanding of the conversion tort.

Conversion is an "ancient theory of recovery" with roots in the common law action of trover. (Ricks, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine* (1991) 1991 B.Y.U. L.Rev. 1681, 1683; see *id.* at pp. 1683–1685 [tracing early development of conversion].) "This action originated at an early date as a remedy against the finder of lost goods who refused to return them to the owner but instead 'converted' them to his own use." (Rest.2d Torts, § 222A, com. a., p. 431.) Over time, the action was extended to cases involving "dispossession, or . . . withholding possession by

_____

that it does not preclude a conversion claim for wages credited against inventory shortages].)

[7] Citing a handful of examples, the dissent asserts that "plaintiffs in wage cases have routinely included a claim for conversion," suggesting that this practice is more telling than the lack of any precedent approving such a cause of action. (Dis. opn., *post*, at p. 7; *id.* at pp. 7–8 [citing cases].) We find these examples less telling than the dissent. It goes without saying that a plaintiff's allegations cannot determine the meaning of the law, and cases containing passing mentions of conversion claims are not authority for the proposition that such claims are cognizable—or even that they have generally been *assumed* to be cognizable. (See, e.g., *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043 ["It is axiomatic that cases are not authority for propositions that are not considered."]; cf., e.g., *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 455, fn. 3 [declining to address the plaintiff's theory of conversion because all of the plaintiff's claims were based on the defendant's alleged violation of overtime laws, which were enforceable under the Labor Code itself].)

others than finders." (*Id.* at p. 432.) Today, the tort of conversion is understood more generally as "the wrongful exercise of dominion over personal property of another." (5 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 810, p. 1115; see, e.g., *Steele v. Marsicano* (1894) 102 Cal. 666, 669.)

As it has developed in California, the tort comprises three elements: "(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages." (5 Witkin, *supra*, § 810, p. 1115; *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208.) Notably absent from this formula is any element of wrongful intent or motive; in California, conversion is a "strict liability tort." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 144 (*Moore*); *id.* at p. 144, fn. 38 [" ' "conversion rests neither in the knowledge nor the intent of the defendant" ' "]; accord, *Poggi v. Scott* (1914) 167 Cal. 372, 375 (*Poggi*) ["neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action. . . . '[T]he tort consists in the breach of what may be called an absolute duty . . . .' "].)

A successful plaintiff in a conversion action is entitled to recover "[t]he value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted" plus "fair compensation for the time and money properly expended in pursuit of the property." (Civ. Code, § 3336; see also 5 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1906, p. 1357.) Punitive damages are recoverable upon

a showing of malice, fraud, or oppression. (Civ. Code, § 3294, subd. (a); accord, *Haigler v. Donnelly* (1941) 18 Cal.2d 674, 681 (*Haigler*); *Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664.) And the Courts of Appeal have held that emotional distress damages are also recoverable by the victim of conversion in appropriate circumstances. (*Spates v. Dameron Hospital Assn.* (2003) 114 Cal.App.4th 208, 221; *Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464, 476.)

The particular question before us concerns the applicability of the conversion tort to a claim for money. Although the question was once the matter of some controversy, California law now holds that property subject to a conversion claim need not be tangible in form; intangible property interests, too, can be converted. (*Payne v. Elliot* (1880) 54 Cal. 339, 342 (*Payne*) [recognizing conversion claim related to ownership interests and monetary value represented by stock shares, irrespective of the conversion of tangible stock certificates].) But the law has been careful to distinguish proper claims for the conversion of money from other types of monetary claims more appropriately dealt with under other theories of recovery. Thus, although our law has dispensed with the old requirement that "each coin or bill be earmarked," it remains the case that "money cannot be the subject of an action for conversion unless a specific sum capable of identification is involved." (*Haigler, supra,* 18 Cal.2d at p. 681; see *PCO, Inc. v. Christensen, Miller, Frank, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395 (*PCO*).) "[W]here the money or fund is not identified as a specific thing the action is to be considered as one upon contract or for debt"—or perhaps upon some other appropriate theory—but "not for conversion." (*Baxter v. King* (1927) 81 Cal.App. 192, 194 (*Baxter*); see *Vu v. California Commerce Club,*

*Inc.* (1997) 58 Cal.App.4th 229, 231, 235 [rejecting conversion claim where the plaintiff could not identify specific sum but only approximate monetary losses]; *PCO*, at p. 397 [same].)

Equally important, the "specific thing" at issue (*Baxter*, *supra*, 81 Cal.App. at p. 194) must be a thing to which the plaintiff has a right of ownership or possession—a right with which the defendant has interfered by virtue of its own disposition of the property. This means that "[a] cause of action for conversion of money can be stated only where a defendant interferes with the plaintiff's *possessory interest* in a specific, identifiable sum"; "the simple failure to pay money owed does not constitute conversion." (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 284.) Were it otherwise, the tort of conversion would swallow the significant category of contract claims that are based on the failure to satisfy " 'mere contractual right[s] of payment.' " (*Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1041 (*Sanowicz*); see *Imperial Valley L. Co. v. Globe G. & M. Co.* (1921) 187 Cal. 352, 353–354.) Contractual provisions may, of course, determine whether the plaintiff has a possessory right to certain funds in the defendant's hands. (See, e.g., *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1072–1074 (*Fischer*) [agency agreement established principal sellers' legal entitlement to converted commissions].) But to put the matter simply, a "plaintiff has no claim for conversion merely because the defendant has a bank account and owes the plaintiff money." (3 Dobbs et al., Law of Torts (2d ed. 2011) § 711, p. 807.)[8]

---

[8] The dissent latches onto our observation in *Trombley* that "wages are not ordinary debts" (*Trombley*, *supra*, 31 Cal.2d at p. 809), and infers from this statement that "unpaid wages are

Consistent with this understanding, cases recognizing claims for the conversion of money "typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others." (*PCO*, *supra*, 150 Cal.App.4th at p. 396.) For instance, one California court has held that a real estate agent may be liable for conversion where he had accepted commissions on behalf of himself and a business partner, but refused to give the partner his share. (*Sanowicz*, *supra*, 234 Cal.App.4th at p. 1042.) Another has held that a sales agent may be liable for the conversion of proceeds from a consignment sale where the agent did not remit any portion of the proceeds to the principal seller. (*Fischer*, *supra*, 50 Cal.App.4th at pp. 1072–1074.) And another has held that a client may be liable to an attorney for conversion of attorney fees received as part of a settlement, where a lien established the attorney's ownership of the fees in question. (*Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599 (*Weiss*).)

The dissent sees these cases as functionally indistinguishable from this one; after all, the dissent reasons, all of these cases involve, at some level, a claim to money earned

---

*not* merely contractual obligations to pay a sum" (dis. opn., *post*, at p. 3). Our decision in *Trombley* addressed the constitutionality of a statute that criminalized the willful nonpayment of wages. (*Trombley*, at pp. 804–810.) We explained that "an employer, who, having the ability to pay, intentionally refuses to pay wages he knows are due, perpetrates a 'fraud' within the meaning of the provision which excepts 'cases of fraud'" from the state constitutional prohibition against imprisonment for debt. (*Id.* at p. 809.) Our observation about the importance of wages in the context of this constitutional inquiry is not fairly read to mean that unpaid wages are, in general, sums already belonging to the employee, as opposed to a debt for the employee's service.

as compensation for performing a service. (See dis. opn., *post*, at pp. 1–2.) But the employee's claim to earned wages differs from these other claims in the ways that matter for purposes of the law of conversion. The employee's claim is not that the employer has wrongfully exercised dominion over a specifically identifiable pot of money that already belongs to the employee— in other words, the sort of wrong that conversion is designed to remedy. Rather, the employee's claim is that the employer failed to reach into its own funds to satisfy its debt. Indeed, in some cases of wage nonpayment, the monies out of which employees would be paid may never have existed in the first place. Take, for example, a failed start-up that generates no income and thus finds itself unable to pay its employees. Because the business accounts are empty, there would not be any identifiable monies for the employer to convert. No one would dispute that the start-up is *indebted* to its employees. But only in the realm of fiction could a court conclude that the business, by failing to earn the money needed to pay wages, has somehow converted that nonexistent money to its own use.

Here, Voris claims a right to money that did once exist, but which he believes was squandered. At least in such cases, Voris argues, the nonpayment of wages should be treated as a conversion of property, not as a failure to satisfy a " 'mere contractual right of payment.' " (*Sanowicz, supra*, 234 Cal.App.4th at p. 1041.) But to accept this argument would require us to indulge a similar fiction: namely, that once Voris provided the promised services, certain identifiable monies in his employers' accounts became Voris's personal property, and by failing to turn them over at the agreed-upon time, his employers converted Voris's property to their own use.

Voris contends that there is precedent for this view. He points in particular to *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163 (*Cortez*), where we said that "earned wages that are due and payable pursuant to section 200 et seq. of the Labor Code are . . . the property of the employee who has given his or her labor to the employer in exchange for that property." (*Id.* at p. 178.) But *Cortez* is less helpful to Voris's case than he suggests; the language he cites concerned the availability of a restitutionary remedy under the Unfair Competition Law (UCL), which provides equitable relief for unfair business practices (Bus. & Prof. Code, § 17200 et seq.), and our holding was expressly limited to that context (*Cortez*, at p. 178). We explained that "unlawfully withheld wages are property of the employee *within the contemplation of the UCL*," not within the contemplation of the law in general. (*Ibid.*, italics added.) Our reasoning, too, was rooted in considerations specific to equitable remedies under the UCL. We reasoned that "equity regards that which ought to have been done as done [citation], and thus recognizes equitable conversion [citation]," and that "restitutionary awards encompass quantifiable sums one person owes to another." (*Ibid.*; see *Earhart v. William Low Co.* (1979) 25 Cal.3d 503, 511, fn. 5 ["while restitution ordinarily connotes the return of something which one party has 'received' from another, the term may also refer to a broader obligation to pay"].)

The reasoning of *Cortez* does not translate readily to this context: While UCL awards may "encompass quantifiable sums one person owes to another" (*Cortez*, *supra*, 23 Cal.4th at p. 178), conversion claims do not. To extend the reasoning of *Cortez* to the tort context would collapse the well-established distinction between a contractual obligation to pay and the tortious

conversion of monetary interests. *Cortez* certainly does not contemplate such a result. Nothing in *Cortez* compels the conclusion that unpaid wages constitute property to which an employee holds an immediate right of possession for purposes of tort law.[9]

---

[9] Nor do the appellate decisions cited in *Cortez*. Our opinion quoted language from a Court of Appeal decision stating that "'[e]arned but unpaid salary or wages are vested property rights.'" (*Cortez, supra*, 23 Cal.4th at p. 178, quoting *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1080.) But much like *Cortez*, *Loehr* did not purport to determine the "property" status of unpaid wages in general. The actual issue in *Loehr* was whether a public employee's claim for unpaid wages was subject to the claim-filing requirements of the Tort Claims Act, Government Code section 900 et seq. That act distinguishes between claims for "money or damages," which are subject to general claim-filing requirements (Gov. Code, § 905), and claims for "fees, salaries, wages, mileage, or other expenses and allowances," which are exempted (*id.*, § 905, subd. (c)). *Loehr* explained that claims for compensation for work *already performed* qualify as claims for "salaries [or] wages," whereas claims for *unearned* compensation fall under the category of claims for "monetary damages." (*Loehr*, at p. 1080; cf. *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22 ["A claim for compensation owed by an employer for services already performed is contractual, and thus is exempt [from certain provisions of the Tort Claims Act.]"].) *Loehr*'s passing reference to property rights was largely unexplained, but appears designed simply to reflect the distinction, for purposes of the Tort Claims Act, between claims for earned (or, in the court's terminology, "vested" [*Loehr*, at p. 1080]) compensation and claims for ordinary damages. That distinction has no bearing on this case.

Voris also relies on *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, in which we held that Labor Code section 351 does not provide a private right of action for an employee to recover gratuities withheld by an employer, but ventured that a common law claim such as conversion might lie "under appropriate circumstances" for an employer's misappropriation of gratuities left for employees. (*Lu*, at p. 604; see *id.* at p. 603.) But *Lu* did not purport to decide that question, and the answer would not control here in any event, for an employer's misappropriation of gratuities is not the same as an employer's withholding of promised wages. When a patron leaves a gratuity for an employee (or employees), it arguably qualifies as a specific sum of money, belonging to the employee, that is capable of identification and separate from the employer's own funds; indeed, the employee (or employees) for whom it was left has ownership of the gratuity by statute. (Lab. Code, § 351 [gratuity is "sole property of the employee or employees to whom

---

The same is true of a more recent appellate decision quoting *Loehr* for the proposition that wages are " 'vested property rights.' " (*Reyes v. Van Elk, Ltd.* (2007) 148 Cal.App.4th 604, 612.) Like *Loehr*, *Reyes* fails to explain the basis for this proposition; and as in *Loehr*, the reference to property rights was made in passing with limited relevance to the issue presented. (*Reyes*, at p. 612 [concluding that the prevailing-wage statute applies equally to citizens and noncitizens].)

Perhaps it is true, as the dissent suggests, that the conversion inquiry does not require an "extensive discourse" on unpaid wages' "nature as 'property.' " (Dis. opn., *post*, at p. 5). But the law certainly does require proof of the " 'plaintiff's ownership or right to possession of' " the money at issue. (*Ibid.*) Neither *Loehr* nor *Reyes* purports to explain why, or how, that element would be satisfied in the context of a claim for unpaid wages.

it was paid, given, or left for"].)  Unpaid wages are different in each of these respects.

Finally, Voris directs our attention to the Court of Appeal's decision in *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084 (*UI Video Stores*). There, in a brief two-paragraph discussion, the court approved a conversion action brought by the Division of Labor Standards Enforcement (DLSE) of the Department of Industrial Relations. DLSE had sued Blockbuster on behalf of Blockbuster employees to recover money that was unlawfully deducted from their paychecks to pay for uniforms, in violation of the applicable wage order.  The parties settled, and as part of the settlement agreement Blockbuster mailed individual checks to the employees in the amount of the wrongful deductions.  But a number of checks were returned as undelivered, and DLSE ordered Blockbuster to deposit those checks in California's unpaid wage fund.  When Blockbuster refused, DLSE filed a second complaint, alleging that Blockbuster's refusal amounted to an unlawful conversion of the checks to its own use.  The Court of Appeal reversed a grant of summary judgment in the defendant's favor, apparently accepting DLSE's argument that it had the right to immediate possession of the checks, in its capacity as an agent of the state and trustee for the employees. (*Id.* at pp. 1094–1096.)

Although *UI Video Stores* involved a conversion action *related to* wrongfully withheld wages, it did not concern a conversion claim *for* the nonpayment of wages.  The act of conversion that the court recognized in *UI Video Stores* was the defendant's misappropriation of certain checks that it had cut and mailed to employees as part of the settlement agreement— checks that at least arguably became the property of the

employees at that time. The defendant's failure to pay wages in the first instance was not remedied through a conversion claim, but rather through DLSE's enforcement action under the Labor Code. Whether the employees could have sustained a conversion action for the unpaid uniform reimbursements themselves is a matter that was not at issue in *UI Video Stores*, and which the court did not address.[10]

For reasons already explained, the nature of the underlying wage claim in *UI Video Stores*, like the nature of the wage claim in this case, is not one that fits easily with traditional understandings of the conversion tort. Unlike the cases involving failure to turn over commissions, for example, which were earmarked for a specific person before being misappropriated and absorbed into another's coffers, a claim for unpaid wages simply seeks the satisfaction of a monetary claim against the employer, without regard to the provenance of the monies at issue. In this way, a claim for unpaid wages resembles other actions for a particular amount of money owed

---

[10]  The dissent reads *UI Video Stores* differently, evidently distracted by the Court of Appeal's reasoning as to DLSE's authority " 'to collect and deposit unpaid benefits.' " (Dis. opn., *post*, at p. 6.) The dissent reads too much into this language. The Court of Appeal addressed DLSE's authority to collect unpaid benefits as a threshold procedural matter; if DLSE did not have legal authority to negotiate the employees' checks for unreimbursed wages, it would have had no authority to bring a conversion claim for the unpaid checks. The Court of Appeal did not purport to hold, as the dissent suggests, that "DLSE could have brought *a conversion action for unpaid wages*" in the first instance. (*Ibid.*) DLSE's operative complaint raised no such question, and the court did not decide it.

in exchange for contractual performance—a type of claim that has long been understood to sound in contract, rather than as the tort of conversion.[11]

## IV.

Voris argues that we should expand the scope of conversion to serve California's "public policy in favor of full and prompt payment of an employee's earned wages." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 82.) We today reaffirm the

---

[11] We do not suggest that any and all claims related to wages necessarily fall outside the bounds of the law of conversion, merely because they relate to wages. The label of monies as "wages" or "commissions" or "fees"—or any other form of compensation for that matter—is not determinative, provided that the claim otherwise satisfies the elements of the conversion tort. (Cf. dis. opn., *post*, at pp. 1–2.) Take, for instance, an employer that pays wages but then removes the money from an employee's account, or that diverts withheld amounts from their intended purposes; that employer may well have committed conversion. (Cf. *U.S. v. Whiting* (7th Cir. 2006) 471 F.3d 792 [employer committed criminal conversion under federal statute by holding money deducted from employees' paychecks in the company's general operating account instead of delivering it to the employees' 401(k) plans or paying the employees' health insurance premiums; once employees had been paid, the deductions belonged to the employees and no longer belonged to the employer].) But absent a similar scenario, the ordinary failure to pay wages does not give rise to conversion. Although the dissent finds "no basis" for this distinction (dis. opn., *post*, at p. 7, fn. 2), its quarrel is with the settled understanding of the difference between asserting dominion over another person's property and failing to pay that person the money he or she is owed. Both are a species of legal wrong, but it does not follow that both constitute the tort of conversion.

vital importance of this policy. But we are not persuaded that expanding the conversion tort is the right way to vindicate it.

As we have noted, with or without a conversion claim, there already exist extensive remedies for the nonpayment of wages. An employee seeking recovery of a contractual right to payment of wages is, of course, entitled to sue for breach of contract or, absent a written agreement, for quantum meruit. But that is far from all. The Legislature has repeatedly acted to supplement these common law remedies with statutory remedies. As a result, today the primary bulwark against nonpayment of earned wages is the Labor Code, which contains a complex scheme for timely compensation of workers, deterrence of abusive employer practices, and enforcement of wage judgments.

As particularly relevant here, the Labor Code secures an employee's right to the full and prompt payment of final wages, whether the employee is terminated (as Voris was) or voluntarily quits. (Lab. Code, §§ 201 [wages earned and unpaid are due immediately upon discharge], 202 [wages are due and payable within 72 hours after employee quits absent previous notice], 2926 [dismissed employee is "entitled to compensation for services rendered up to the time of such dismissal"], 2927 [same for employee who quits].) Employers that willfully fail to comply with sections 201 or 202 are subject to penalties. (*Id.*, § 203 [statutory waiting time penalties mandate continued payment of employee's daily wage for up to 30 days]; see *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1400.)

The Labor Code also imposes special sanctions on individual directors, officers, or managing agents who are responsible for wage nonpayment. Perhaps most significantly, the code makes willful failure to pay wages or false denial of a

valid wage claim a criminal offense punishable as a misdemeanor. (Lab. Code, § 216; see *Trombley*, *supra*, 31 Cal.2d at p. 801.) In addition, the Legislature has imposed civil penalties payable to the state by "every person who unlawfully withholds wages due any employee in violation of" certain code sections (Lab. Code, § 225.5); these penalties are higher for "willful or intentional" violations and, after an initial violation, include 25 percent of the amount unlawfully withheld (Lab. Code, § 225.5, subd. (b)).[12] (These were some of the relevant code provisions in effect at the time Voris's claims accrued; as discussed below, the Legislature has since enacted additional remedies against individual directors and officers.)

At least as applied to employers (as opposed to individual officers or directors), a conversion claim for unpaid wages would

---

[12] Employees can seek relief under these provisions through multiple procedural avenues. They can file a wage claim with the Labor Commissioner, who may then pursue the claim on behalf of the employee, or they can file a civil suit (as Voris has done here), and, if successful, recover attorney fees, costs, and prejudgment interest. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1115 [outlining these procedural options]; see Lab. Code, §§ 98–98.8 [preserving parties' rights to seek de novo review in court of Commissioner's decision]; *id.*, § 218 [preserving wage claimant's right to sue directly for nonpayment of certain wages and penalties]; *id.*, § 218.5, subd. (a) [authorizing attorney fees and costs]; *id.*, § 218.6 [authorizing prejudgment interest].)

In addition to these Labor Code remedies, as we have already mentioned, recovery of unpaid wages is authorized under the UCL, at Business and Professions Code section 17200 et seq. (*Cortez*, *supra*, 23 Cal.4th at p. 178; see *id.* at p. 179 ["UCL remedies are cumulative to remedies available under other laws"].)

largely duplicate these remedies and, to that extent, would serve little purpose. But Voris argues that a tort remedy has certain advantages the present remedial scheme lacks. For one, it would enhance deterrence of intentional wage nonpayment by authorizing the recovery of consequential, emotional distress, and, most importantly, punitive damages; this enhanced recovery, in turn, would incentivize attorneys to take cases on behalf of wage claimants who otherwise might not have private representation. Perhaps more to the point, Voris argues, a conversion claim would allow him to reach Lampert directly; because Lampert allegedly participated in the companies' deliberate withholding of wages and strategic insolvency, Voris maintains that Lampert can be held personally liable for damages in tort. (See *Frances T.*, *supra*, 42 Cal.3d at p. 504.) Voris asserts that the threat of personal liability would deter similar misconduct by corporate officers who participate in their employers' bad-faith avoidance of wage obligations and judgments.

We do not doubt that the threat of liability for consequential, punitive, and emotional distress damages could enhance the deterrence of intentional wage nonpayment. Although existing law already prescribes serious consequences for willful nonpayment—including both civil penalties and criminal sanctions—we agree that additional forms of tort damages could well play some role in preventing intentional misconduct, especially when combined with the strict liability standard and three-year statute of limitations that apply to conversion actions. (*Moore*, *supra*, 51 Cal.3d at p. 144, fn. 38 [strict liability standard]; *AmerUS Life Ins. Co. v. Bank of America, N.A.* (2006) 143 Cal.App.4th 631, 639 [statute of limitations].)

But a conversion claim is an awfully blunt tool for deterring intentional misconduct of this variety. As noted, conversion is a strict liability tort. It does not require bad faith, knowledge, or even negligence; it requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession. (*Moore, supra*, 51 Cal.3d at p. 144, fn. 38; *Poggi, supra*, 167 Cal. at p. 375.) For that reason, conversion liability for unpaid wages would not only reach those who act in bad faith, but also those who make good-faith mistakes—for example, an employer who fails to pay the correct amount in wages because of a glitch in the payroll system or a clerical error. We see no sufficient justification for layering tort liability on top of the extensive existing remedies demanding that this sort of error promptly be fixed.

Voris argues that "well-settled principles of tort law" would appropriately cabin a newly recognized conversion claim. But he offers no principle that would limit conversion liability to only those bad actors he has in mind. He points to the "case by case consideration" of factors that inform this court's recognition of tort duties, such as the foreseeability of harm and the nexus between the defendant's conduct and the plaintiff's injury. (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 808.) But he fails to explain how these factors would impose any meaningful limits in the context of a claim for wage nonpayment, which invariably and directly injures employees. (See *Trombley, supra*, 31 Cal.2d at pp. 809–810.)

Voris also attempts to soften the blow of expanding conversion liability by emphasizing the procedural hurdles that constrain punitive damage awards. He notes that while punitive damages would generally be available in a conversion suit, they would not be available in cases of good-faith mistake

and the like, because punitive damages may be imposed only on "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) But it is not unusual for juries to find malice supporting punitive damage awards in run-of-the-mill wage suits. (E.g., *Brewer v. Premier Golf Properties, LP* (2008) 168 Cal.App.4th 1243, 1250 [jury awarded server $195,000 in punitive damages for employer's Labor Code violations].) The possibility of such awards would almost certainly incentivize wage claimants to allege "oppression, fraud, or malice" in such cases. And even if less culpable defendants would not be held liable for punitive damages, they could still be held to pay for the value of the converted property and interest, plus the value of the plaintiff's time and money expended in pursuit of the unpaid wages. (Civ. Code, § 3336.) In the end, given the nature of the conversion tort, "it would be difficult if not impossible to formulate a rule that would assure that only 'deserving' cases give rise to tort relief." (*Foley*, *supra*, 47 Cal.3d at p. 697.)

Voris's more fundamental aim in this case is, of course, to reach individual officers who are responsible for their companies' evasion of their established wage obligations. But Voris fails to explain why his proposed conversion claim is a necessary or appropriate response to this problem. For one thing, although many of the existing remedies for wage nonpayment authorize recovery from employers and not individual officers, that is not true of all; corporate officers and managing agents do face statutory liability for their willful misconduct pertaining to wage nonpayment. (E.g., Lab. Code, §§ 216 [misdemeanor liability], 225.5 [civil penalties].) Moreover, where there is evidence that officers or directors have abused the corporate form, a plaintiff may proceed on a theory

of alter ego liability. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.) Indeed, in this very case, Voris made alter ego allegations against Lampert. The Court of Appeal noted, in its first opinion, that "Voris's opening brief sets forth a lengthy list of Lampert's alleged misdeeds," which, if properly supported, might sustain allegations of alter ego liability; the claim failed because Voris did not follow the applicable rules of civil procedure in marshaling evidentiary support for those alter ego allegations. Voris offers no adequate explanation for this default, and neither he nor the dissent explains why the availability of alter ego liability would not offer an effective response to the concerns he raises in this case.[13]

Voris and the dissent both likewise pay insufficient attention to the considerable body of statutory law that is specifically designed to directly punish and deter employers that fail to satisfy wage judgments. Under the Labor Code, if an employer fails to satisfy a wage judgment or is convicted of violating wage laws, the Labor Commissioner can require the employer to post a bond with the state in order to continue doing business in California. (Lab. Code, § 240, subds. (a)–(c) [description of bonds, accountings, and judicial actions Labor Commissioner can bring against noncompliant employers]; *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1128–1129.) If the Commissioner does not take action despite repeat

---

[13] Amicus Curiae Asian Americans Advancing Justice argues that alter ego claims are often prohibitively difficult for unrepresented litigants to navigate. It is not clear, however, why the appropriate response to this difficulty would be to recognize a conversion claim based on unpaid wages—which could be brought against all employers—as opposed to other, more targeted solutions.

violations by an employer, private individuals can seek a temporary restraining order to halt the employer's business without waiting for the Commissioner to enjoin it first. (Lab. Code, § 243.) In addition to these measures, the Wage Theft Prevention Act of 2011 imposes fines and jail sentences on employers that evade wage judgments: an unpaid wage judgment of $1,000 or less triggers a fine of up to $10,000 and a jail sentence up to six months, and an unpaid judgment of more than $1,000 triggers a fine of up to $20,000 and a jail sentence up to 12 months. (*Id.*, § 1197.2, subd. (a).) The act also authorizes employees to recover attorney fees and costs incurred in the private enforcement of wage judgments. (*Id.*, § 1194.3.)[14]

As various Labor Code provisions illustrate, the Legislature can craft rights and remedies that target those employers and individual officers who withhold wages willfully and repeatedly, and who strategically evade wage judgments. Indeed, after Voris filed this suit, the Legislature enacted Senate Bill No. 588 (Senate Bill 588) to address the precise problem Voris alleges: "Irresponsible employers [that] may have hidden their cash assets, declared bankruptcy, or otherwise become judgment-proof" to avoid adverse wage

---

[14] Besides these tools under the Labor Code, Voris has at his disposal multiple statutory remedies designed to facilitate the collection of civil judgments and to combat improper judgment evasion. For instance, the Enforcement of Judgments Law (Code Civ. Proc., §§ 680.010–724.260) authorizes judgment creditors to use liens, levies, and writs of execution to compel payment. And the Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq.) permits a defrauded creditor to reach property that has been fraudulently transferred by a judgment debtor to a third party.

judgments. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) as amended July 1, 2015, p. 4.)[15] Senate Bill 588 is designed to address the problem by enhancing the sanctions against employers that ignore adverse wage judgments. If an employer fails to satisfy (or timely appeal) a final wage judgment, the employer is now required to file a bond with the state to satisfy the unpaid judgment or else halt all business in California. (Lab. Code, § 238, subds. (a)–(c).)[16] Further, the Labor Commissioner is now equipped to employ stop orders (*id.*, § 238.1, subd. (a)) and to levy property, money, and credits belonging to the employer but possessed by third parties (*id.*, § 96.8; Code Civ. Proc., §§ 690.020–690.050). And to avoid attempts at evasion by an employer that strategically becomes judgment-proof and then effectively continues its

---

[15] The legislative history sheds light on the concerns that prompted passage of Senate Bill 588. Based on studies showing that "the vast majority of wage theft victims received nothing, and those that received anything received little of what they were legally due" (Sen. Com. on Labor & Industrial Relations, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) Apr. 29, 2015, pp. 5–6), the legislative history points to a need for legislation to "discourage business owners from rolling up their operations and walking away from their debts to workers" (Assem. Com. on Labor & Employment, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) as amended July 1, 2015, p. 6).

[16] Labor Code section 240 already authorizes the Commissioner to impose a similar bond requirement, but it does not *mandate* such action. While section 240 leaves the bond amount in the Commissioner's discretion, newly enacted section 238 imposes minimum bond amounts ranging from $50,000 to $150,000, depending on the unsatisfied portion of the judgment. (*Id.*, §§ 238, subd. (a), 240, subd. (a).)

business under another name, the mandatory bond requirements apply equally to successor employers that are "similar in operation and ownership" to their predecessors. (Lab. Code, § 238, subd. (e).)[17]

Senate Bill 588 also targets individual officers who are involved in the failure to pay wages or to satisfy final wage judgments. Under newly enacted Labor Code section 558.1, "[a]ny employer *or other person acting on behalf of an employer*, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, *may be held liable as the employer for such violation*." (Lab. Code, § 558.1, subd. (a), italics added.) " '[O]ther person acting on behalf of an employer' is limited to a natural person who is an owner, director, officer, or managing agent of the employer." (*Id.*, subd. (b).) Individual officers are also subject to civil and criminal penalties for failing to observe Senate Bill 588's new enforcement laws. Should an employer continue doing business without posting the bond required under Labor Code section 238, any "person acting on behalf of [the] employer" is subject to a civil penalty of $2,500. (*Id.*, § 238, subd. (f).) Finally, if an

_____

[17] More precisely, a successor employer "shall be deemed the same employer . . . if (1) the employees of the successor employer are engaged in substantially the same work in substantially the same working conditions under substantially the same supervisors or (2) if the new entity has substantially the same production process or operations, produces substantially the same products or offers substantially the same services, and has substantially the same body of customers." (Lab. Code, § 238, subd. (e).)

"owner, director, officer, or managing agent of the employer" fails to observe a stop order issued by the Commissioner, he or she is guilty of a misdemeanor and can face up to 60 days in jail and/or a fine up to $10,000. (*Id.*, § 238.1, subd. (b).)[18]

These legislative solutions may not be perfect. But the history of wage-payment regulation in this state, beginning more than a century ago and continuing through the present day, shows us both that the Legislature has been attentive to the problem and that it is capable of studying the range of possible solutions and fashioning appropriately tailored relief.

By contrast, the conversion claim Voris asks us to recognize neither fits well with the traditional understanding of the tort, nor is well suited to address the particular problem he alleges. A conversion claim for unpaid wages would reach well beyond those individual corporate officers who withhold wages to punish disfavored employees or who deliberately run down corporate coffers to evade wage judgments. As the Court of Appeal in this case observed, to recognize such a claim would authorize plaintiffs to append conversion claims to every garden-variety suit involving wage nonpayment or underpayment. The effect would be to transform a category of contract claims into torts, and to pile additional measures of tort damages on top of statutory recovery, even in cases of good-faith mistake. In light of the extensive remedies that already exist to combat wage nonpayment in California, we decline to take that step.

---

[18] Senate Bill 588 was not in effect at the time Voris filed suit, and the parties agree that it does not apply retroactively. But Voris offers no reason to think its enforcement-related provisions do not apply to his existing wage judgments.

## V.

We agree with Voris on this critical point: The full and prompt payment of wages is of fundamental importance to the welfare of both workers and the State of California. The Legislature has so recognized by crafting extensive remedies to ensure that employees are paid in full, and in penalizing employers that fail to live up to their obligations. This court has so recognized in upholding the Legislature's authority to adopt new solutions to combat the problem. (E.g., *Trombley, supra*, 31 Cal.2d at p. 801; *Ballestra, supra*, 173 Cal. at p. 658; see also *Indian Spring, supra*, 37 Cal.App. at pp. 380–381.) We express no views here on whether additional, appropriately tailored remedies are called for. We hold only that a conversion claim is not an appropriate remedy. For that reason, we decline to supplement the existing set of remedies for wage nonpayment with an additional tort remedy in the nature of conversion.

We affirm the judgment of the Court of Appeal.


**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**GROBAN, J.**

VORIS v. LAMPERT

S241812

Dissenting Opinion by Justice Cuéllar


In exchange for promised compensation in the form of wages and stock, plaintiff Brett Voris worked with defendant Greg Lampert in a series of start-up ventures. After Voris discovered what he believed to be financial misconduct in the management of these entities, he was fired. He successfully sued the three ventures, obtaining awards that totaled nearly $350,000. But because Lampert allegedly ran down the companies' accounts and mismanaged the startups into insolvency, Voris has been unable to collect on these judgments. In this proceeding he seeks to recover against Lampert, who (he claims) either directed or participated in the start-ups' failure to pay him the compensation he had earned. He relies on common law conversion — a tort that is often used to recover compensation that has been earned yet has not been paid.

The majority opinion acknowledges but then sidesteps this crucial feature of California tort law: that numerous plaintiffs have successfully sought compensation for their labor through the tort of conversion. (See maj. opn., *ante*, at pp. 14-16.) Under settled case law, Voris could properly invoke conversion to recover money due if Lampert, his partner in a joint venture, had exercised dominion and control over, say, his share of real estate commissions. (See *Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1042.) He could use conversion if Lampert, as his agent, had failed to pay Voris the proceeds from the sale of consigned goods. (See *Fischer v. Machado* (1996) 50

Cal.App.4th 1069, 1073-1074.)  The majority likewise concedes that a worker may assert conversion to recover money owed for the worker's efforts if the worker happens to be an attorney seeking to recover fees from a client's award.  (See *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599.)   Indeed, Voris successfully invoked conversion *in this case* to recover the component of his compensation that consists of stock.  (See maj. opn., *ante*, at pp. 4-5.)  Only when *wages* — the common way by which workers make their way in the world — are sought does the majority suddenly decide that the tort of conversion somehow peters out, because it's just "not the right fit."  (*Id*. at p. 1.)

That's a conclusion I cannot embrace.   Unlike the majority, I wouldn't close the courthouse door when a worker invokes the conversion tort to recover earned but unpaid wages.  In California, unpaid wages are the employee's *property* once they are earned and payable.  (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 178 (*Cortez*); *Reyes v. Van Elk, Ltd.* (2007) 148 Cal.App.4th 604, 612 (*Reyes*); *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1096 (*UI Video Stores*); *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1080 (*Loehr*).)  Which is why an action for unpaid wages is not, as the majority suggests, merely an "action[] for a particular amount of money owed in exchange for contractual performance." (Maj. opn., *ante*, at p. 22.)  The doctrinal basis for invoking conversion here is as solid as California's longstanding concern about wage theft.  Indeed, nothing in the legislative scheme or public policy more generally justifies limiting the tort in the manner the majority proposes. So with respect, I dissent.

## I.

What seems to most trouble the majority about allowing Voris to recover his unpaid wages by asserting conversion is the risk of blurring the common law distinction between contract and tort. In the majority's view, allowing workers to assert the conversion tort to recover wages they are due "would collapse the well-established distinction between a contractual obligation to pay and the tortious conversion of monetary interests." (Maj. opn., *ante*, at p. 18.) The fear is unfounded. In California, unpaid wages are *not* merely contractual obligations to pay a sum. This is because, as we long ago observed, "wages *are not ordinary debts*." (*In re Trombley* (1948) 31 Cal.2d 801, 809, italics added.) The reason for this is practical: "because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due." (*Ibid.*; see also maj. opn., *ante*, at pp. 7-8, 23.)

A recent study estimated that minimum wage violations alone cost California workers nearly $2 billion per year. (Cooper & Kroeger, *Employers Steal Billions From Workers' Paychecks Each Year* (May 10, 2017) Economic Policy Inst., p. 10, Table 1 <https://www.epi.org/files/pdf/125116.pdf> [as of Aug. 13, 2019].)[1] When workers cannot collect wages they are owed, they are unable to pay for food, housing, or other bills. They spend less overall, slowing local economies and decreasing tax revenue for state and local governments. And employers who fail to pay wages in full and on time create an uneven playing field in which

---

[1] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

law-abiding businesses are unable to compete. What happened to Voris, in effect, leads to a badly distorted and fundamentally unfair marketplace for both labor and consumers. Even if Voris's plight does not precisely resemble the kind of wage theft too often afflicting lower-income workers, Voris has not been paid what the courts have determined he is owed — and no one disputes this.

Where unpaid wages diverge from garden-variety contractual promises to pay a debt is in the fundamental importance of earned wages to workers, their families, and the public. Our case law has repeatedly highlighted and enforced that distinction. In *Cortez*, *supra*, 23 Cal.4th 163, for example, we declared that "[o]nce earned, those unpaid wages became property to which the employees were entitled." (*Id.* at p. 168.) Indeed, they are "as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice" (*id.* at p. 178) — the latter being the type of property that could surely form the basis of a conversion action. It is the exchange of labor for money — and the pivotal role of worker wages — that cause unpaid wages to become the worker's property even when those funds are still in the employer's possession. (See *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1402 (*Pineda*); *Reyes*, *supra*, 148 Cal.App.4th at p. 612 [unpaid wages are " 'vested property rights' " within the meaning of the state Constitution]; *Loehr*, *supra*, 147 Cal.App.3d at p. 1080 ["Earned but unpaid salary or wages are vested property rights . . . ."].) That the unpaid wages may be commingled with the employer's general funds does not disqualify them as property that may be converted, so long as the sum owed is specific and definite. (See maj. opn., *ante*, at p.

13; *Fischer v. Machado, supra,* 50 Cal.App.4th at pp. 1072-1073.)

The majority goes to great lengths to marginalize California case law establishing that earned but unpaid wages are, indeed, the worker's property. In their view, *Cortez*'s characterization of wages as property should be strictly limited to the context of the Unfair Competition Law. (Maj. opn., *ante,* at pp. 17-18.) But in no way are the significance of worker pay and the urgent need that it be paid in a timely manner logically limited to the four corners of that statutory scheme. Even less convincing is the majority's puzzling criticism of the characterization in *Reyes* and *Loehr* as "largely unexplained." (Maj. opn., *ante,* at p. 19, fn. 9.) To establish the first element of the conversion tort, it's enough to show "plaintiff's ownership or right to possession of personal property." (5 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 810, p. 1115.) No extensive discourse on its nature as "property" is required. (See *ibid.*; cf. *Welco Electronic, Inv. v. Mora* (2014) 223 Cal.App.4th 202, 215, fn. omitted ["Although the parties have not cited any authority that expressly covers the facts here, our application of the tort of conversion in this case is consistent with existing legal principles"].)

In any event, one can find such an analysis in *UI Video Stores, supra,* 55 Cal.App.4th 1084 — a decision that Lampert urges us to overrule but that the majority evidently reads "differently." (Maj. opn., *ante,* at p. 21, fn. 10.) There, the Court of Appeal sustained a conversion action brought by the Department of Industrial Relations against Blockbuster Video for Blockbuster's failure to comply with the terms of a settlement agreement requiring it to deposit into the state's unpaid wage fund sums that had been wrongfully withheld from

employees who could not be located. One part of the court's analysis upholding the conversion cause of action focused, as the majority does, on the role of the Division of Labor Standards Enforcement (DLSE) as a trustee of these sums under the settlement agreement. (*UI Video Stores*, at p. 1096.) But the court went on to uphold the conversion action on a second basis — one independent of the settlement agreement. In that passage, the court explained that "the DLSE need not possess legal title to the property at issue to support a cause of action for conversion. A person without legal title to property may recover from a converter if the plaintiff is responsible to the true owner, such as in the case of a bailee or pledgee of the property." (*Ibid*.) The DLSE had precisely such an interest, the court concluded, because it was empowered "to collect and deposit unpaid benefits." (*Ibid*.; see Lab. Code, § 96.7, subd. (a) ["The Labor Commissioner shall act as trustee of all such collected unpaid wages or benefits, and shall deposit such collected moneys in the Industrial Relations Unpaid Wage Fund"].) In other words, the DLSE could have brought *a conversion action for unpaid wages* because it was empowered to collect such sums on behalf of the affected employees. (See *Sims v. AT&T Mobility Services LLC* (E.D.Cal. 2013) 955 F.Supp.2d 1110, 1120 (*Sims*) ["The *Blockbuster* decision alone is sufficient authority to find that a cause of action for conversion of unpaid wages is viable"].)

I have difficulty understanding why a state agency may sue for conversion of unpaid wages on behalf of the workers who earned those wages, but (in the majority's view) those workers are barred from asserting that conversion cause of action

directly. So far as I can see, nothing in the doctrine requires this anomalous result.[2]

The majority finds it "notable" that no precedential California decision has yet recognized a conversion claim based on withholding of wages. (See maj. opn., *ante*, at p. 10.) More conspicuous, to my mind, is the absence of any precedential decision *refusing* to recognize a conversion claim in these circumstances. For some time, plaintiffs in wage cases have routinely included a claim for conversion. (See, e.g., *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 455, fn. 3 [conversion claim for unpaid overtime]; *Falk v. Children's Hospital Los*

---

[2] The majority opinion disclaims any intent to categorically foreclose a conversion cause of action simply because the property converted happens to be wages, and the majority suggests that such a claim might lie in unusual circumstances not present here. As examples, the majority offers the circumstance where an employer "pays wages but then removes the money from an employee's account" or "diverts withheld amounts from their intended purposes." (Maj. opn., *ante*, at p. 22, fn. 11.) Yet nowhere does it explain why some peculiar sleight of hand involving employee financial accounts may support a conversion claim while the ordinary failure to pay earned wages — discrete monies our case law repeatedly characterizes as employee property — does not. I appreciate the majority's implicit acknowledgement in footnote eleven that it would be wrong to simply conclude that conversion can never play any conceivable role in ameliorating wage theft. But there's no basis to suggest that conversion ordinarily lacks a role in addressing wage theft, or to draw distinctions based on whether the employer simply refuses to pay owed wages or has the wages momentarily show up in an account before siphoning them off. Both situations, after all, involve the employer's withholding of funds that are constructively possessed by the employee. (See *Pineda, supra,* 50 Cal.4th at p. 1402 ["The vested interest in unpaid wages . . . arises out of *the employees*' action, i.e., their labor"].)

*Angeles* (2015) 237 Cal.App.4th 1454, 1458 [claim for "[c]onversion and theft of labor" for failure to timely pay wages]; *On-Line Power, Inc. v. Mazur* (2007) 149 Cal.App.4th 1079, 1082 [conversion claim for unpaid wages]; *Dunlap v. Superior Court* (2006) 142 Cal.App.4th 330, 333 [claim for "conversion and theft of labor"]; *Stark v. CVS Pharmacy* (Super.Ct. L.A., 2012, No. BC476431) 2012 Cal.Super. LEXIS 13832, *1-*3 [trial court order overruling demurrer to conversion claim for unpaid wages]; accord, *Sims, supra*, 955 F.Supp.2d at pp. 1119-1120 ["there is clear authority under California law that employees have a vested property interest in the wages that they earn, failure to pay them is a legal wrong that interferes with the employee's title in the wages, and an action for conversion can therefore be brought to recover unpaid wages"].)

Despite this history, though, no party or amicus curiae has pointed us to evidence of any ill effects. Nor have they identified any adverse effects arising from the recognition of wage conversion claims in other jurisdictions. (See maj. opn., *ante*, at pp. 9-10, fn. 6.) What we *do* know is that the nonconversion remedies in existence at the time Voris filed suit were inadequate. Despite "the considerable body of statutory law that is specifically designed to directly punish and deter employers that fail to satisfy wage judgments" (maj. opn., *ante*, at p. 29), it is still "difficult and rare for workers in California to recover stolen wages." (Sen. Jud. Com., analysis of Sen. Bill No. 588, as amended Apr. 20, 2015 (2015-2016 Reg. Sess.) p. 15.) According to a 2013 report by the National Employment Law Project and the UCLA Labor Center, only 17 percent of prevailing wage claimants before the DLSE between 2008 and 2011 recovered *any payment at all*. (Cho et al., *Hollow Victories: The Crisis in Collecting Unpaid Wages for California's Workers*

(Mar. 2015) Nat. Employment Law Project, p. 2 <https://www.nelp.org/wp-content/uploads/2015/03/Hollow-Victories-Unpaid-Wages-Report.pdf> [as of Aug. 13, 2019].) Those who did prevail managed to recover, on average, only 15 cents on the dollar. (*Ibid.*) Conversion actions — like the one here — offer the possibility of recovery in situations where the relevant corporate entity is insolvent, and would increase the financial consequences of withholding an employee's earned wages or other personal property. But there's no reason to think such actions would spur litigation beyond circumstances where the employee's personal property is at issue and, in any event, all civil litigation is subject to a variety of judicial constraints.

To say in light of these characteristics that conversion simply is not "the right fit for the wrong" (maj. opn., *ante*, at p. 1), nor "an appropriate remedy" (*id.* at p. 35), is to assume a conclusion about rights, wrongs, and remedies as puzzling as it is difficult to justify. For the workers who aren't being paid what they earned, it hardly matters whether the nonpayment or underpayment was the product of deliberation or mistake — the financial hit to the worker's income is a heavy burden either way. And to make whole a worker who is forced to sue to recover unpaid wages, there must be an award of interest and attorney fees. (See Civ. Code, § 3336.) The majority seems worried that employers who wrongfully withhold wages could be "held to pay for the value of the converted property and interest, plus the value of the plaintiff's time and money expended in pursuit of the unpaid wages." (Maj. opn., *ante*, at p. 28.) Yet the possibility of an award that compensates an employee for everything the employee has lost as a result of the defendant's failure to pay in full and on time is precisely the point of allowing such an action to proceed: a feature, not a bug.

True: A conversion cause of action does raise the prospect of punitive damages. But only in cases where the plaintiff can establish malice, fraud, or oppression by clear and convincing evidence. (See Civ. Code, § 3294, subd. (a).) And it is not enough merely to "allege" malice, fraud, or oppression. (Maj. opn., *ante*, at p. 28.) Our pleading rules require a plaintiff to allege the requisite elements of a punitive damages claim in more than "conclusionary terms." (*Cyrus v. Haveson* (1976) 65 Cal.App.3d 306, 317; see also *Grieves v. Superior Court* (1984) 157 Cal.App.3d 159, 166 ["Not only must there be circumstances of oppression, fraud or malice, but facts must be alleged in the pleading to support such a claim"].) In any event, the majority does not explain why punitive damages should be available when an employer acts with malice, fraud, or oppression in withholding compensation in the form of, say, stock or commissions but must be barred when the same employer converts employees' unpaid wages to its own use. (Cf. *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176, fn. 10 ["[employer] cites no instance in which tort liability has been denied in an entire class of cases on the ground that punitive damages would be available in aggravated circumstances"].)

Indeed, such a distinction — which is fundamental to the majority's conclusion — seems entirely illusory. As we have recognized, stock issued to an employee as compensation "also constitute[s] a wage." (*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 619.) So do commissions. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 804 [commissions can constitute " ' "wages" ' "].) Yet under the majority's ruling, Voris ends up being able to assert conversion of one part of his wages (stock), but not the remainder of his wage compensation. (See *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148

Cal.App.4th 97, 125 ["We see no sound basis in reason to allow recovery in tort for one but not the other"].) For the vast majority of California workers, who are not offered stock incentives, today's decision risks relegating them to second-class status.

What's particularly odd about the majority's reasoning is its unwillingness to see conversion for what it is: an action that applies to "every species of personal property." (*Payne v. Elliot* (1880) 54 Cal. 339, 341.) Nor, when confronted with particular types of property that are closely analogous to those in prior conversion cases, do courts ask, at every turn, whether a purportedly limited tort should be expanded. Provided that the analogy is sufficiently close — which I believe is true here — the question properly becomes whether something in the legislative scheme (or in the common law itself) justifies a restriction on the tort's scope. No such justification appears.

It's certainly true that the Legislature has been active in this area. But ordinarily legislative action is no basis for casting aside otherwise applicable common law remedies — and here, the Legislature has also acted with a measure of humility, especially relative to the scope of the problem. The 2015 statutory changes underscore the continuing importance the Legislature assigns to the recovery of unpaid wages. Experience shows, though, that the problem is unlikely to disappear entirely even under the most optimistic scenarios and even assuming aggressive enforcement and implementation of Senate Bill No. 588 (2015-2016 Reg. Sess.). (See, e.g., Gollan, *California Regulators Aren't Taking Action Against Care Homes That Ignore Wage Theft Judgments* (May 20, 2019) The Center for Investigative Reporting <www.revealnews.org/article/california-regulators-arent-taking-action-against-care-homes-

that-ignore-wage-theft-judgments/> [as of Aug. 13, 2019].) The most reasonable inference is that these legislative remedies were " 'meant to supplement, not supplant . . . , existing . . . remedies, in order to give employees the maximum opportunity to vindicate their . . . rights." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 74-75.)

In this case, Voris claims he can allege that Lampert, as controlling officer or director of these ventures, was entrusted with Voris's wages. Lampert is also one of the persons who could have been sued individually for unpaid wages, had Senate Bill No. 588 been in effect at the time. Recognizing the availability of a tort claim of conversion, as a complement to the legislative scheme, seems consistent with the tort's broad scope under California law and with the manner in which state legislative remedies and the common law traditionally interact. (See *Fischer v. Machado, supra,* 50 Cal.App.4th at pp. 1074-1075 [recognizing a conversion cause of action despite the existence of state and federal statutory remedies]; see generally *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1156 ["When courts enforce a common law remedy despite the existence of a statutory remedy, they are not 'say[ing] that a different rule for the particular facts should have been written by the Legislature.' [Citation.] They are simply saying that the common law 'rule' coexists with the statutory 'rule' "].) This may also help victims of wage theft and society as a whole by better aligning employers' incentives with the full extent of the individual and social costs associated with the conversion of unpaid wages. (See generally Pound, The Spirit of the Common Law (1921) p. 174 [the common law "is and must be used, even in an age of copious legislation, to supplement, round out and develop the enacted element"].)

## II.

The Court of Appeal unanimously sustained Voris's stock conversion claim but, in a split decision, affirmed the trial court's ruling granting judgment on the pleadings on the wage conversion claim. I find no principled reason to distinguish between these two components of Voris's compensation. Because the majority holds otherwise, I dissent with respect.

**CUÉLLAR, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Voris v. Lampert

_____

**Unpublished Opinion** XXX NP opn. filed 3/28/17 – 2d Dist., Div. 3
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S241812
**Date Filed:** August 15, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Michael L. Stern

_____

**Counsel:**

Anderson Yeh, Edward M. Anderson and Regina Yeh for Plaintiff and Appellant.

Jean H. Choi, Zachary Genduso and Jay Shin for Asian Americans Advancing Justice-Los Angeles, Bet Tzedek, Los Angeles Alliance for a New Economy and The Wage Justice Center as Amici Curiae on behalf of Plaintiff and Appellant.

Paul Kujawsky; Wilson, Elser, Moskowitz, Edelman & Dicker and Robert Cooper for Defendant and Respondent.

Orrick, Herrington & Sutcliffe, Julie A. Totten and Katie E. Briscoe for Employers Group and California Employment Law Council as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Regina Yeh
Anderson Yeh
401 Wilshire Boulevard, 12th Floor
Santa Monica, CA  90401
(310) 496-4270

Jay Shin
The Wage Justice Center
3250 Wilshire Boulevard, 13th Floor
Los Angeles, CA  90010
(213) 273-8400

Robert Cooper
Wilson, Elser, Moskowitz, Edelman & Dicker
555 South Flower Street, Suite 2900
Los Angeles, CA  90071
(213) 4443-5100