Filed 1/6/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JUSTIN SPILMAN et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>THE SALVATION ARMY,<br><br>        Defendant and Respondent. | A169279<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-21-591364) |

Plaintiffs Justin Spilman, Teresa Chase, and Jacob Tyler (collectively "Spilman") worked full time for the Salvation Army, a nonprofit organization, in various operations that supported its retail thrift stores. Spilman worked without wages as part of a six-month, residential, substance abuse rehabilitation program. He now alleges that, under California law, the Salvation Army was required to pay him the minimum wage and overtime. The trial court determined that the wage laws do not apply because Spilman was a volunteer, not an employee, and it granted summary judgment to the Salvation Army. We agree that a volunteer for a nonprofit organization can fall outside the wage laws, but we conclude the trial court applied the wrong standard to distinguish a volunteer from an employee. We reverse and remand the case for further proceedings.

**BACKGROUND**

**A.**

The Salvation Army is a nonprofit religious organization that owns and operates facilities in San Francisco, Stockton, and

Chico that provided the six-month residential drug and alcohol rehabilitation programs attended by the plaintiffs. Seeking substance abuse treatment, Spilman, Chase and Tyler each voluntarily entered a Salvation Army adult rehabilitation program on one or more occasions between 2015 and 2020. Spilman and Chase selected the Salvation Army's program to resolve criminal proceedings via probation rather than incarceration.

Each rehabilitation facility has a residence, where rehabilitation program participants live and attend classes and meetings; a warehouse for collection and processing of goods donated to the Salvation Army; and a thrift store, where donated goods are sold to the public. The Salvation Army uses revenue generated by the thrift store sales to fund its charitable activities, including the rehabilitation program.

Program participants receive benefits including dormitory housing, three meals per day, clothing, gratuities, and rehabilitation services. Gratuities consist of canteen cards redeemable only at the rehabilitation center and small quantities of cash. Rehabilitation services include classes, church services, Bible study, Alcoholics Anonymous 12-step program meetings, and biweekly one-on-one counselling sessions.

Participants are required to work in various functions that support the Salvation Army warehouse and thrift store, which the Salvation Army terms "work therapy." Persons unable or unwilling to perform work therapy (or to participate in any other aspect of the program) are ineligible for the rehabilitation programs. Participants generally work full time.[1] The Salvation

---

[1] The parties dispute whether participants are required to work a minimum or a maximum of 40 hours per week. Spilman, Chase and Tyler each assert that they often worked more than 40 hours in a week.

Army prohibits participants from obtaining outside employment during the program.

According to the Salvation Army, work therapy is designed to teach participants life skills, discipline, work ethics, and good habits; assist participants in reentering the workforce; reduce idle time during their recovery; and simulate real-world interactions so that participants can practice their skills and coping mechanisms. Spilman disputes that work therapy serves or is intended to serve these goals.

As part of the work therapy, Spilman performed tasks including loading and unloading trucks, accepting and sorting donations, moving carts of donated goods, and picking up donations. Chase's work included sorting and cleaning donated items, serving as a runner, inventorying items for sale, assisting customers, operating machinery in the warehouse, and working at the front desk. Tyler unloaded and sorted boxes of donated items, placed clothes on hangers and racks, organized hangers and racks, created store displays, unloaded trucks, cleaned the bathroom, helped shoppers locate items, and staffed the front desk at the residence. The Salvation Army controlled the work schedule, tasks, and conditions, as well as all other aspects of the rehabilitation programs.

Spilman asserts, and the Salvation Army disputes, that participants performed the same tasks as workers whom the Salvation Army classified as employees and paid at least the minimum wage. The parties further dispute whether the Salvation Army used volunteer workers to replace paid workers, reduce costs, and maximize revenue.

In addition, the parties dispute whether the Salvation Army provided volunteers with room and board, food, clothing, and gratuities as a form of payment for work they performed. According to the Salvation Army, it provided these benefits to ensure that participants could focus on their recovery and

3

"spiritual regeneration," to meet their "personal needs" while in the program, or as small "gifts" for making progress.

Participants who miss scheduled work due to illness are required to make up missed work and programming. The parties dispute whether the Salvation Army could reduce a participant's gratuity based on poor work performance, and they dispute the extent to which the Salvation Army could discipline or discharge a participant for failing to work or for falling short of productivity goals or other performance expectations. There's no dispute, however, that the Salvation Army could discharge a participant who refused to engage in any part of the rehabilitation program, including work therapy.

To enroll in the rehabilitation programs, participants sign documents stating that they agree and understand that they are not Salvation Army employees. Participants also receive program handbooks and forms stating that the participants are not employees, are not on salary, and do not receive compensation; that the gratuities were a "gift" or "allowance" rather than payment for work performed; and that "work therapy" could help participants develop skills and work habits.

## B.

Spilman filed a class and representative action complaint, alleging that the rehabilitation center participants were employees and that the Salvation Army failed to pay them minimum wage and overtime and violated related obligations under California law. The parties stipulated that the trial court should resolve cross-motions for summary adjudication on the question whether Spilman was a Salvation Army employee under state law. In connection with their cross-motions, each party raised numerous objections to the other party's evidence.

In granting the Salvation Army's motion for summary adjudication, the trial court concluded that Spilman was not an

4

employee under the wage provisions of the Labor Code because "a key threshold" requirement for employee status is "the existence of an express or implied agreement for compensation." The court reasoned that, "[a]s a general rule under California law, unpaid workers who voluntarily perform services without any express or implied agreement for remuneration are not employees." The court further explained that "the employment relationship under California law is fundamentally contractual, and . . . an expectation of compensation is essential to such a relationship, such that voluntary unpaid workers are not employees." The court held that this rule was "dispositive" here, and that because Spilman "voluntarily participated in [the Salvation Army's] alcohol and drug rehabilitation programs without any written employment contract or any reasonable expectation of receiving compensation for [his] labor, [he is] not [an] 'employee[]' within the meaning of the Labor Code."

In so holding, the trial court declined to rule on most of the evidentiary objections, stating that "many of the parties' evidentiary objections and factual disputes are beside the point" because they were "not material to [the court's] resolution of the issue before it."

Concluding that the issue of Spilman's volunteer status was dispositive, the trial court subsequently entered judgment in favor of the Salvation Army.

## DISCUSSION

A motion for summary judgment or adjudication must be granted if there is no triable issue as to any material fact, such that the movant is entitled to prevail as a matter of law. (See Code Civ. Proc. § 437c, subds. (c), (f)(1), (p)(2).) We review de novo a trial court's determination that no triable issue of material fact exists. (See *Harris v. Thomas Dee Engineering Co., Inc.* (2021) 68 Cal.App.5th 594, 604.) Our review is likewise de novo where, as here, the trial court's summary judgment or

5

adjudication ruling turns on the interpretation and application of a statutory scheme. (See *City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 395.)

## A.

We begin with some background law.

California's wage laws aim to ensure that vulnerable workers are afforded wages and working conditions sufficient to support their subsistence and safeguard their health and welfare. (*Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 952 (*Dynamex*)*; Martinez v. Combs* (2010) 49 Cal.4th 35, 53-55 (*Martinez*).) In addition to helping workers, the wage laws benefit law-abiding employers, who would otherwise have to compete against "those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards" (Lab. Code, § 90.5, subd. (a)[2]), and they benefit the public at large, who would be obliged to support workers whose wages are too low for their daily needs (*Dynamex*, at pp. 952-953).

Under section 1194, "[n]otwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee" may recover the unpaid wages in a civil action. (§ 1194, subd. (a).) The statute does not define the employees and employers to which it applies. (*Martinez*, *supra*, 49 Cal.4th at p. 52.) Instead we must look to the Industrial Welfare Commission's wage orders, which fix the minimum wage. (*Martinez*, at pp. 52-57; *Dynamex, supra,* 4 Cal.5th at p. 936, fn. 14; see also § 1197.) The Commission's "wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law." (*Dynamex*, at p. 914, fn. 3.) Although the Legislature defunded the Commission in 2004, its wage orders

---

[2] Undesignated statutory references are to the Labor Code.

remain in effect. (*Dynamex*, at p. 936, fn. 14; see *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [noting that the Division of Labor Standards Enforcement enforces the wage orders].)

The wage order applicable here is Wage Order No. 7, which concerns the mercantile industry. (See Cal. Code Regs., tit. 8, § 11070, subds. 1., 2.(I).) The wage order defines an employee as "any person employed by an employer." (*Id.* subd. 2.(E).) " 'Employ' " has two alternative standards: to "engage" or to "suffer[] or permit to work." (*Id.* subd. 2.(D); see also *Martinez, supra*, 49 Cal.4th at p. 64 [noting a third formulation which expands the definition of " ' "[e]mployer" ' " to include one who " 'employs or exercises control over the wages, hours, or working conditions of any person,' " italics omitted].)

We are primarily concerned with the second standard. The first standard, to engage, means to "creat[e] a common law employment relationship." (*Martinez, supra,* 49 Cal.4th at p. 64.) Traditional volunteers do not have a common law master-servant relationship with the nonprofit organization to which they contribute their labor, so they are not "engage[d]." (See *id.* at p. 64.) The suffer or permit standard, however, sweeps more broadly: it is triggered when an employer merely " 'permit[s]' " unlawful labor " 'by acquiescence' " or suffers the unlawful labor by " 'fail[ing] to hinder' " it. (*Id.* at p. 58, italics omitted.) This standard does not require a common law employment relationship because it was intended to cover "irregular working arrangements" that might otherwise circumvent the labor laws— for example, employers who sought to evade child labor laws by using such labor without formally hiring the children. (*Ibid.*) Thus, the question is whether a volunteer falls within the definition of an employee as one who is "suffer[ed] or permit[ed]" to work. (Cal. Code Regs., tit. 8, § 11070, subd. 2.(D).) Neither

7

the statute nor the wage order expressly addresses the status of unpaid volunteers for nonprofit organizations.

California case law on this question is limited. The leading case is *Woods v. American Film Institute* (2021) 72 Cal.App.5th 1022 (*Woods*), which held that that "persons may volunteer for nonprofit entities . . . without becoming employees" under the wage laws. (*Id*. at p. 1041; see also *id*. at pp. 1035-1039.) In *Woods*, unpaid volunteers helped stage a four-day film festival for a nonprofit film institute, performing tasks such as working in the box office and distributing tickets. (*Id*. at pp. 1026-1027.) *Woods* reasoned, in part, that the wage laws' objectives— "protecting workers from exploitation; protecting businesses from unfair competition; and protecting the public from the need to assist workers who were compelled to labor for substandard pay or in substandard conditions—apply to businesses that employ *paid* labor. They do not apply to persons who intend to volunteer their time to nonprofit entities." (*Id*. at p. 1038.)

*Woods* also observed that treating all volunteers as employees would devastate religious, charitable, cultural, and other nonprofit organizations. (*Woods*, *supra*, 72 Cal.App.5th at p. 1039.) Indeed, state law accommodates volunteers in numerous ways. (*See id*. at pp. 1035-1036.) For example, volunteers have long been excluded from prevailing wage requirements on public works projects. (See § 1720.4, subd. (a)(1); *Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1155.) Worker's compensation laws likewise carve out volunteers from the definition of " '[e]mployee.' " (See § 3352, subds. (a)(2), (a)(9); see also § 3363.6, subd. (a).)

But *Woods* noted that some situations may present a closer question. For example, although the Division of Labor Standards Enforcement agrees that, for purposes of the wage orders, a volunteer who works at a nonprofit is not an employee "if he or she 'intends to volunteer his or her services for public service,

8

religious, or humanitarian objectives,' " the agency has opined that the person would be an employee if he or she worked for a commercial enterprise operated by the same nonprofit. (See *Woods*, *supra*, 72 Cal.App.5th at p. 1038, citing Division of Labor Standards Enforcement, Opinion Letter No. 1988.10.27 (Oct. 27, 1988) <https://www.dir.ca.gov/dlse/opinions/1988-10-27.pdf> [as of Jan. 6, 2026]; see also Division of Labor Standards Enforcement, Enforcement Policies and Interpretations Manual (rev. Aug. 2019) § 43.6.7 <https://www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf> [as of Jan. 6, 2026].) *Woods* also cited case law suggesting that unpaid interns—an adjacent concept to volunteers because both are motivated by personal reasons to work without wages—may be considered employees in situations where, for instance, their labor would otherwise be unfairly exploited. (*Woods*, at p. 1040, citing *Glatt v. Fox Searchlight Pictures, Inc.* (2d Cir. 2015) 811 F.3d 528, 535 (*Glatt*); see also *Kao v. Holiday* (2017) 12 Cal.App.5th 947, 955-956 (*Kao*), disapproved on other grounds by *Naranjo v. Spectrum Security Services, Inc.* (2024) 15 Cal.5th 1056, 1090 & fn. 11.) Recognizing that the issue of volunteers or unpaid interns in commercial businesses "may be subject to debate," *Woods* found these concerns "not . . . compelling" in the case before it, which involved a nonprofit film institute rather than a "for-profit commercial business." (*Woods*, at p. 1041.) Ultimately, *Woods* did not purport to define a general test for distinguishing between volunteers and employees. (See *id.* at p. 1034.)[3]

_____

[3] The specific question in *Woods* was whether the trial court correctly declined to certify a class of volunteer workers at a film festival run by a nonprofit organization. (*Woods, supra,* 72 Cal.App.5th at pp. 1025-1026.) *Woods* held that because the proposed class was "broad enough to include persons who expected to be paid," as well as some who expected no compensation, the trial court acted within its discretion in

Federal case law is more extensive and includes cases with facts even closer to our case than *Woods*. Like our wage orders, the federal Fair Labor Standards Act of 1938 (FLSA; 29 U.S.C. § 201 et seq.) includes the suffer or permit standard for employment.[4] (See 29 U.S.C. § 203(g).) Under that standard, federal courts have held that persons may volunteer their labor without being employees. (See *Tony & Susan Alamo Foundation v. Secretary of Labor* (1985) 471 U.S. 290, 295, 300 & fn. 21 (*Alamo Foundation*); *Walling v. Portland Terminal Co.* (1947) 330 U.S. 148, 152 (*Walling*).) For purposes of the FLSA, the Supreme Court has generally described a volunteer as a person who, " 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit.' " (*Alamo Foundation,* at p. 295, quoting *Walling*, at p. 152.) Unfortunately, however, the federal courts have applied inconsistent versions of an ill-defined standard for determining whether a volunteer should be classified as an employee.

In *Alamo Foundation*, the Supreme Court held that unpaid workers who had been rehabilitated by a nonprofit religious foundation were employees of the foundation's commercial enterprises. (*Alamo Foundation*, *supra*, 471 U.S. at pp. 291-292, 301-302, 306.) In finding that the workers were employees rather than volunteers, *Alamo Foundation* discounted the workers' own insistence that they were volunteers, instead considering the " 'economic reality' " of the relationship, including whether the

denying certification because common issues would not predominate. (*Id*. at pp. 1026, 1034.)

[4] Although our Supreme Court has explained that California's adoption of the suffer or permit standard preceded the federal law, and the state's "wage orders are intended to provide broader protection" (*Dynamex*, *supra*, 4 Cal.5th at p. 956), the court has also found federal cases persuasive on aspects of the suffer or permit standard. (*See id*. at p. 960.)

workers received compensation in any form or instead worked for a personal purpose, were fined for poor performance, worked long hours, or were dependent on the nonprofit organization for extended periods. (*Id*. at pp. 295, 299-300 & fn. 21, 301-302 & fn. 22.) *Alamo Foundation* also considered the public policy goals of the FLSA, reasoning that, if some workers could waive wage and hour protections by asserting they were volunteers, then employers may be able to coerce employees into doing so; such exceptions would put a "downward pressure on wages in competing businesses," negatively affecting all workers and undermining the requirement of a minimum wage. (*Id*. at p. 302.)

In contrast, *Fochtman v. Hendren Plastics, Inc.* (8th Cir. 2022) 47 F.4th 638 (*Fochtman*) employed a slightly different test to conclude that participants who worked as part of a court-ordered substance abuse treatment program were not employees under Arkansas law, which incorporates the suffer or permit to work standard and looks to the FLSA for guidance. (*Id*. at pp. 644-647.) In so holding, *Fochtman* considered which party primarily benefitted from the arrangement; whether there was an express or implied agreement for compensation; and whether finding an employment relationship was consistent with the purposes of the minimum wage statute. (*Ibid*.; see also *Vaughn v. Phoenix House New York, Inc.* (2d Cir. 2020) 957 F.3d 141, 145-146 (*Vaughn*) [concluding that a resident at a substance abuse treatment program was not an employee under the FLSA after applying a " 'primary beneficiary test' " adapted from the internship context]; *Klick v. Cenikor Found.* (5th Cir. 2024) 94 F.4th 362, 366, 372 (*Klick*) [remanding for the trial court to evaluate a vocational therapy program by considering "the plaintiffs' expectation of compensation, the therapeutic value of the [p]rogram, whether the relationship displaces paid employees, and any other considerations that may 'shed light on which party primarily benefits from the relationship' "].)

11

Some federal courts have decided cases involving Salvation Army rehabilitation programs, but they too have applied different tests with arguably contradictory results. *Williams v. Strickland* (9th Cir. 1996) 87 F.3d 1064 (*Williams*) held that Salvation Army rehabilitation participants were not employees, placing primary reliance on whether the parties had an express or implied agreement for compensation, but also considering the "solely rehabilitative" nature of the parties' relationship. (*Id.* at pp. 1067-1068; see also *Harris v. Salvation Army* (S.D. Fla. Mar. 26, 2025, 23-61420-CIV-CANNON/HUNT) [nonpub. opn.] [granting summary judgment to the Salvation Army after concluding that the rehabilitation center worker was not an employee based on whether there was an expectation of compensation, whether the work provided benefits to the worker, the duration of the program, and whether the work displaces the work of paid employees].)

On the other hand, *Alvear v. Salvation Army* (N.D. Ga. 2023) 661 F.Supp.3d 1314 (*Alvear*) held that work therapy participants had stated a cognizable claim that they were employees after considering whether the workers had an expectation of compensation, which party most benefitted from the labor, and whether finding an employment relationship would support or hinder the purposes of the wage and hour laws. (*Id.* at p. 1321.) (See also *Clancy v. Salvation Army* (N.D. Ill. Jan. 31, 2023, 22 CV 1250) [nonpub. opn.] [holding that the rehabilitation center participants had stated a claim that they were employees after considering any expectation of compensation, the primary beneficiary of the relationship, the extent to which the plaintiffs were dependent on the Salvation Army, and the policy goals of "achieving minimum labor standards and preventing unfair competition"].)

**B.**

We turn now to the issues presented.

**1.**

The first issue is whether volunteers for nonprofit organizations, as a general category, are outside the scope of the wage order.

Our Supreme Court analyzed an analogous issue in *Dynamex*. In *Dynamex*, the court considered whether drivers working for a delivery service are properly categorized as employees or as independent contractors for purposes of a wage order. (*Dynamex*, *supra*, 4 Cal.5th at pp. 914, 917.) The wage order in *Dynamex* contained the same definition of "employ" as the wage order in our case, and it did not expressly address the status of independent contractors. (*Id*. at p. 926.) *Dynamex* observed that, if interpreted literally, the plain language of "suffer or permit to work"—the wage order's broadest definition of "employ"—would cover independent contractors, effectively making them all employees. (*Id*. at pp. 916, 948-949.)

*Dynamex* rejected such a literal interpretation, instead holding that independent contractors are impliedly exempt. Noting the basic purposes of the wage laws—to ensure that workers are provided the minimum wages and conditions necessary for their subsistence, health, and welfare—the court explained that the suffer or permit to work standard must be broadly understood to include as employees "all individual workers who can reasonably be viewed as 'working in the [hiring entity's] business.' " (*Dynamex*, *supra*, 4 Cal.5th at p. 953, italics omitted, quoting *Martinez*, *supra,* 49 Cal.4th at p. 69.) The "suffer or permit to work" standard does not, however, encompass individuals who traditionally would not "reasonably" or "realistically" have been viewed as working in the hiring entity's business, like plumbers and electricians. (*Dynamex,* at p. 953.) Because "genuine" independent contractors "have traditionally been viewed as working in their own independent business," they "could not reasonably have been intended by the wage order to be

13

treated as employees." (*Id.* at pp. 916, 949, 953.)  *Dynamex* therefore held that independent contractors are a separate category from employees.  (*Id.* at p. 953.)

We find a similar situation here.  If applied literally, the suffer or permit to work standard would make all nonprofit volunteers employees.  Like independent contractors, however, volunteers for nonprofit organizations comprise a traditional category of worker that cannot reasonably be viewed as employees.  As *Woods* explained, nonprofit volunteer work is well-established in analogous provisions of the Labor Code.  (See *Woods, supra,* 72 Cal.App.5th at pp. 1035-1036.)  Countless statutes outside the Labor Code likewise recognize the important service of nonprofit volunteers across our state.[5]  The wage orders could not have been intended to categorically eliminate volunteer work in California, which would cripple the ability of many

---

[5] For example, under California law, volunteers with nonprofit organizations help mentor public school students (see Gov. Code, § 96110, subd. (b)(5)); staff community health programs (Health & Saf. Code, § 120871, subd. (a)); rehabilitate incarcerated people (Pen. Code, § 7460, subd. (c)); and rescue wildlife injured by oil spills (Gov. Code, § 8670.37.5, subd. (g)(3)).  In recognition of the critical services provided by volunteers to the people of California, our Legislature has also enacted provisions that incentivize volunteerism or remove barriers to volunteer service, including by limiting the liability of some volunteers (see, e.g., Corp. Code §§ 5047.5, subd. (a), 5239, subd. (a), 7231.5, subd. (a), 9247, subd. (a); Code Civ. Proc., § 425.15, subd. (a); Health & Saf. Code, § 120392.3, subd. (e); Civ. Code, § 1714.26, subd. (a)); awarding scholarships or grants for volunteers (see, e.g., Ed. Code, § 69731, subd. (c); Pen. Code, § 5027, subd. (a)); and providing exemptions from licensure, tax, or other requirements related to nonprofit volunteers (see e.g., Bus. & Prof. Code, §§ 4996.14, subd. (b), 17510.3, subd. (d); Rev. & Tax. Code, § 6363.7).

humanitarian, charitable, and other nonprofit organizations to carry out their important missions.  (See *Woods*, at p. 1039.)

An exception for volunteers is also fully consistent with the purposes of our state's wage laws to protect the health and welfare of workers and ensure a subsistence standard of living.  (See *Dynamex*, *supra*, 4 Cal.5th at p. 952*; Martinez*, *supra*, 49 Cal.4th at pp. 53-55; *Woods, supra*, 72 Cal.App.5th at pp. 1037-1038.)  So long as the individual freely, without coercion, volunteers to perform work for a charity for personal, nonremunerative reasons and the organization is not improperly misclassifying the worker to circumvent the law, a volunteer exception harmonizes with our Legislature's goal of eradicating substandard conditions for vulnerable workers.  (Cf. § 1720.4, subd. (a)(1) [providing that "[a]n individual shall be considered a volunteer only when their services are offered freely and without pressure and coercion, direct or implied, from an employer"]; see also *Alamo Foundation, supra*, 471 U.S. at p. 295 [describing a volunteer as one who works without compensation for their " 'personal purpose or pleasure' "].)

Moreover, contrary to the Division of Labor Standards Enforcement's opinion, we see no reason to categorically exclude volunteers from all commercial functions of a nonprofit's operations.  (Division of Labor Standards Enforcement, Opinion Letter No. 1988.10.27 (Oct. 27, 1988) p. 1 [asserting, without explanation, that nonprofit organizations may not utilize volunteers when operating "commercial enterprises"]; see *Dynamex*, *supra*, 4 Cal.5th at p. 946 [explaining that the Division's guidance is "not entitled to the deference ordinarily accorded to formal administrative regulations, [so the] court must independently determine the meaning and scope" of the applicable wage order].)  Many nonprofits engage in commercial activities to raise money, whether by selling tickets to a benefit dinner or other event—as in *Woods*, *supra*, 72 Cal.App.5th at

15

pages 1026-1027; by hosting bake sales or selling cookies, like the Girl Scouts; by selling branded t-shirts or other merchandise, as many museums do; or by running thrift stores, as does the Salvation Army. Presumably, volunteers often want to support a nonprofit's mission by working in these "commercial" functions. Nothing supports a blanket rule that effectively bars them from doing so. Moreover, a blanket rule would be hard to square with other worker classifications, such as interns, who sometimes work without pay at for-profit commercial firms. (See *Glatt*, *supra*, 811 F.3d at pp. 534-536; *Vaughn*, *supra*, 957 F.3d at pp. 145-146 [noting overlap between volunteers and interns].)

As in *Dynamex*, the more complicated question is determining how to categorize workers in particular cases. We now turn to that issue.

### 2.

When determining a standard for independent contractors, the *Dynamex* court noted that the existing state and federal cases (including *Alamo Foundation*) used a variety of multifactor tests and considered the totality of the circumstances. (See *Dynamex*, *supra*, 4 Cal.5th at pp. 953-957.) The court rejected this vague, multifactor approach because it is too unpredictable for workers and businesses and it may give unscrupulous employers more room to evade the law. (*Id.*, at pp. 954-955.) The court opted for a "simpler, more structured test" in which an employer must demonstrate the presence of three conditions that differentiate independent contractors from employees.[6] (*Id.* at p. 955; see also,

---

[6] Under *Dynamex*, a worker is an employee rather than an independent contractor unless the hiring entity establishes: "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is

16

*id.* at pp. 959-964.) The inquiry should also consider the policies underlying the suffer or permit standard, including the potential for employers to evade the wage orders by using their superior bargaining power to exploit workers or gain a competitive advantage over other businesses. (*Id.* at pp. 959-964; see also *Martinez*, *supra*, 49 Cal.4th at p. 62 [noting the court's consistent enforcement of wage orders to ensure they are effective and to "prevent evasion and subterfuge"].)

Guided by *Dynamex*, we take a similar approach. Here, too, as explained above, the existing (mostly federal) cases use inconsistent standards, which makes compliance unpredictable and may encourage evasion. A simpler test would focus on the differences between volunteers and employees, as well as the goal of preventing evasion of the wage orders. Accordingly, we adopt a two-part test for distinguishing between employees and volunteers of nonprofit organizations. When the question is whether a nonprofit organization has properly classified a worker as an unpaid volunteer rather than an employee, the nonprofit must establish that (1) the worker freely agreed to work for the nonprofit to obtain a personal or charitable benefit, rather than for compensation, and (2) overall, the nonprofit organization's use of the volunteer labor is not a subterfuge to evade the wage laws.[7] We explain these factors in turn.

---

customarily engaged in an independently established trade, occupation, or business." (*Dynamex*, *supra*, 4 Cal.5th at p. 964.)

[7] In applying this test, we agree with Spilman that once the worker provides prima facie evidence of employment, it is the defendant who bears the burden of proving that the worker should be exempted as a non-employee. (See *Dynamex*, *supra*, 4 Cal.5th at p. 957; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795; *Kao*, *supra*, 12 Cal.App.5th at pp. 956-957.)

*Volunteer Working for Personal or Charitable Benefit*

The essential distinction between a volunteer and an employee, for our purposes, is that a volunteer agrees to work for a personal or charitable reason or benefit, rather than to earn money. (See *Alamo Foundation*, *supra*, 471 U.S. at pp. 295, 300; see also § 1720.4, subd. (a); Division of Labor Standards Enforcement, Opinion Letter No. 1988.10.27 (Oct. 27, 1988) p. 1.) In the classic case, a person is motivated to perform uncompensated work by a desire to advance a cause championed by the nonprofit. In other instances, as in this one, the person works to obtain a benefit, like drug rehabilitation. Spilman and Chase had the added incentive of participating in the rehabilitation program in lieu of imprisonment. (See *Fochtman*, *supra*, 47 F.4th at p. 646 [concluding that participants in a court-ordered recovery program were not employees where, inter alia, they "undertook the recovery program for their own purposes"]; *Vaughn*, *supra*, 957 F.3d at p. 146.)

Accordingly, a person who agrees to perform work in exchange for wages, rather than to obtain a personal benefit, is an employee, not a volunteer. (Cf. § 1720.4, subd. (a); § 3352, subds. (a)(2), (a)(9); *Alamo Foundation*, *supra*, 471 U.S. at pp. 295, 300; see also Division of Labor Standards Enforcement, Opinion Letter No. 1988.10.27 (Oct. 27, 1988) p. 1; § 1194, subd. (a).) The court must therefore consider whether there is evidence of an express or implied promise of compensation. (Cf. § 1720.4, subd. (a); § 3352, subds. (a)(2), (a)(9).) Such an agreement could involve compensation "in the form of ordinary wages" or, instead, nonmonetary benefits that, in the context of the entire relationship, constitute "wages in another form." (*Alamo Foundation*, at pp. 293-294; cf. § 1720.4, subd. (a)(2) ["An individual may receive reasonable meals, lodging, transportation, and incidental expenses or nominal nonmonetary awards without losing volunteer status if, in the entire context of the situation,

18

those benefits and payments are not a substitute form of compensation for work performed."].)[8]

In assessing whether in-kind benefits are compensation provided in exchange for labor, the court should consider whether the nonprofit makes the benefits contingent on the worker's labor and satisfactory performance, which would tend to indicate the benefits are compensation and thus weigh in favor of finding an employment relationship. In *Alamo Foundation*, for example, the workers were barred from getting food from the cafeteria if they were absent from work due to illness or injury, which suggested that the benefits were "wages in another form." (*Alamo Foundation, supra*, 471 U.S. at p. 301 & fn. 22; see also *Alvear, supra*, 661 F.Supp.3d at p. 1321.) On the other hand, in the case of a rehabilitation program, for example, evidence that the worker's room and board, small gratuities, or similar benefits are typical of, or required for, rehabilitation and treatment programs may weigh against deeming them compensation. (See, e.g., *Williams, supra*, 87 F.3d at p. 1068.)

---

[8] Under California law, remuneration need not be limited to cash compensation. For example, Wage Order No. 7 reflects that lodging and meals can be a form of "compensation" or "wages," requiring that employers keep records of the "[t]otal wages paid [to each employee for] each payroll period, including value of board, lodging, or other compensation actually furnished to the employee." (See Cal. Code Regs., tit. 8, § 11070, subd. 7.(A)(4).) Consistent with the understanding that food and lodging can be a form of compensation, the wage order provides that "[m]eals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee." (See Cal. Code Regs., tit. 8, § 11070, subd. 10.(C); see also *id*. subd. 1. [providing that the wage order applies "to all persons employed in the mercantile industry whether paid on a time, piece rate, commission, *or other basis*" (italics added)].)

Moreover, the nonprofit should demonstrate that the individual chose to volunteer their services freely, without coercion by the nonprofit. (See § 1720.4, subd. (a)(1).) An employer may not use its "superior bargaining power to coerce employees to . . . waive their protections" under the wage laws. (See *Alamo Foundation*, *supra,* 471 U.S. at p. 302; see also *Dynamex*, *supra*, 4 Cal.5th at p. 960, quoting *Alamo Foundation*, at p. 302; § 1194, subd. (a) [providing that the minimum wage requirement applies "[n]otwithstanding any agreement to work for a lesser wage"].) A criminal defendant can, however, rationally choose a voluntary rehabilitation program as a condition of a probation agreement to avoid a jail or prison sentence. (See, e.g., *Vaughn, supra*, 957 F.3d at p. 146; *Fochtman, supra*, 47 F.4th at pp. 646-647.) The nonprofit, which is not responsible for the defendant's criminal predicament, does not coerce the defendant simply by offering a court-approved program.

The duration of a volunteer relationship may also be relevant. For example, in the context of a rehabilitation program, the provision of in-kind benefits over a long period suggests the program is more like an ordinary job than a legitimate effort to treat a drug or alcohol addiction. (Compare *Alamo Foundation*, *supra*, 471 U.S. at p. 301 [concluding that where, inter alia, the workers were " ' entirely dependent' " on the nonprofit organization for prolonged periods and in some cases years, in-kind benefits received by workers constituted wages and the workers were employees] with *Williams*, *supra*, 87 F.3d at p. 1068 [concluding that the reasonable six month duration of the substance abuse treatment program supported a finding that the worker was a volunteer].)

If the nonprofit fails to establish that the worker has freely agreed to work for a personal benefit rather than for compensation, the inquiry ends and the worker must be deemed

an employee.  If the nonprofit satisfies the first factor, however, then the court must proceed to the second factor.

*No misclassification to evade wage laws*

Even when a person is willing to volunteer their labor, the worker may not properly be deemed a volunteer if the nonprofit is exploiting the situation to evade the wage laws.  Accordingly, in addition to requiring the existence of a bona fide volunteer agreement, the nonprofit must demonstrate that classifying the worker as a volunteer rather than an employee is not a subterfuge to obtain substandard labor.  (See § 90.5, subd. (a); *Martinez*, *supra,* 49 Cal.4th at pp. 53-56; *Dynamex*, *supra,* 4 Cal.5th at pp. 952-953, 960.)

In the context of a rehabilitation program, for example, the nonprofit should show that the promised "work therapy," together with other relevant aspects of the program, is reasonably calculated to serve a rehabilitative purpose, rather than being a ploy for sidestepping wage protections at the expense of workers and competing businesses.  (See § 90.5, subd. (a); *Martinez*, *supra,* 49 Cal.4th at pp. 53-56; *Dynamex*, *supra,* 4 Cal.5th at pp. 952-953, 960.)  Ordinarily, this should be a limited inquiry.  In most cases, it should suffice for the nonprofit to show that it has an actual and reasonable belief that the work therapy, along with other elements of the program, contributes to rehabilitation.  The goal is to enforce the policies underlying the wage laws, not to regulate the effectiveness of nonprofit rehabilitation programs or the quality of other promised benefits.  For instance, *Williams* concluded (on summary judgment) that a participant's labor was "solely rehabilitative" where the work "was performed to give him a sense of self-worth[ and] accomplishment, and [it] enabled him to overcome his drinking problems and reenter the economic marketplace."  (*Williams*, *supra*, 87 F.3d at pp. 1067-1068.)  In contrast, *Alvear* held (on the pleadings) that the participants' work served no rehabilitative

21

purpose and provided them no personal benefit where, allegedly, the "volume of work leaves little time for rehabilitation," the rehabilitation services were " 'rudimentary,' " and the program provided no job or skills training.  (*Alvear*, *supra*, 661 F.Supp.3d at p. 1324.)

Additionally, the court may consider whether the organization is using volunteers to replace, and perform the same functions as, preexisting paid employees, which may indicate the organization's use of volunteers, overall, is a scheme to avoid compliance with the wage laws and place downward pressure on wages for its employees.  (See *Klick*, *supra*, 94 F.4th at p. 372; see also *Alamo Foundation*, *supra*, 471 U.S. at p. 302.)  This may be particularly relevant when volunteers work in commercial ventures within the nonprofit.  If unpaid volunteers and paid employees perform identical work in a commercial venture, it may suggest the nonprofit is attempting to gain a competitive advantage "at the expense of [its] workers."  (§ 90.5, subd. (a); *Dynamex*, *supra*, 4 Cal.5th at pp. 952-953, 960; see also *Alamo Foundation*, *supra*, 471 U.S. at p. 302.)  It may also support other evidence that the nonprofit is unfairly exploiting workers by improperly coercing them to volunteer their labor.

We note that there is some inherent tension between volunteer work and wage law policy.  Presumably, any organization *could* pay somebody to do the work of a volunteer, and using volunteers rather than employees will lower its costs. This tension is implicitly recognized by federal decisions that consider whether the volunteer or the nonprofit is the *primary* beneficiary in the relationship, not simply whether the nonprofit receives *any* benefit.  (E.g., *Fochtman*, *supra*, 47 F.4th at pp. 645-646.)  Under the inquiry here, courts must distinguish between circumstances that merely reflect the tension inherent in any nonprofit volunteer arrangement and circumstances that indicate evasion, subterfuge, and exploitation.

This is not an exhaustive discussion. Courts should consider any other evidence as to whether the nature of the working relationship is exploitative, indicating an evasion of the wage laws. (See § 90.5, subd. (a).)

## C.

The trial court in this case applied a different analysis, making the existence of an agreement for compensation a litmus test for status as an employee. We agree with Spilman that the trial court erred in rejecting his claim of employee status for that reason.

In concluding that an agreement for compensation is the dispositive test here, the trial court relied heavily on *Voris v. Lampert* (2019) 7 Cal.5th 1141 (*Voris*), a case that involved not a wage claim, but a common law conversion claim. (*Id.* at p. 1144.) In that context, *Voris* observed: "The employment relationship . . . is 'fundamentally contractual,' meaning it is governed in the first instance by the mutual promises made between employer and employee. [Citations.] The promise to pay money in return for services rendered lies at the heart of this relationship." (*Id.* at p. 1148.) Following *Voris*, the trial court held that an agreement for compensation was necessary for a person to qualify as an employee because "fundamental contractual principles govern[] the formation and existence of an employment relationship under California law." (See also *Woods*, *supra*, 72 Cal.App.5th at p. 1034 [citing *Voris* for the proposition that a contractual employment relationship requires a promise of payment, but declining to decide whether "the expectation of compensation is a necessary condition to be an employee in *all* contexts"].)

But *Voris* also recognized that "[t]he Legislature has repeatedly acted to supplement . . . common law [contractual] remedies with statutory remedies," describing the statutory protections in the Labor Code as "the primary bulwark against nonpayment of earned wages." (*Voris*, *supra*, 7 Cal.5th at p.

23

1157; see also *id.* at p. 1148 ["Beginning more than a century ago, the Legislature began to *supplement* existing contract remedies with additional worker protections designed to 'safeguard' the worker 'in his relations to his employer in respect of hours of labor and the compensation to be paid for his labor,' " italics added].)

As *Voris* reflects, and as our Supreme Court made clear in *Martinez*, the Labor Code's protections for employees go well beyond those afforded by a traditional contractual relationship. (See *Martinez, supra,* 49 Cal.4th at pp. 57-58.) The wage law's definition of the term " ' "[e]mploy" ' "—" 'to engage, suffer, or permit to work' "— incorporates the common law contractual relationship between master and servant "*as one alternative*": the term " 'to engage' " means " 'to employ,' that is, to create a common law employment relationship." (*Id.* at p. 64, some italics omitted.) But employment is not limited to a contractual relationship: under the suffer or permit to work standard, the employer " 'shall not *employ* by contract, nor shall he *permit* by acquiescence, nor *suffer* by a failure to hinder.' " (*Id.* at p. 69; *see also id.* at p. 58.) The wage law's definition thus provides protection "even when no common law employment relationship exist[s]." (*Id.* at p. 58; see also *id.* at p. 64 [explaining that the Commission defined employment to "extend[] its regulatory protection to workers whose employment status the common law did not recognize"]; *Dynamex, supra,* 4 Cal.5th at p. 958 ["the suffer or permit to work definition was intended to be broader and more inclusive than the common law test"].)

The Salvation Army, like the trial court, also relies on section 2775, subdivision (b)(1), enacted in 2020, which provides: "For purposes of this code . . . , and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor." (Assem. Bill

No. 2257 (2019-2020 Reg. Sess.), Stats. 2020, ch. 38, § 2, eff. Sept. 4, 2020.)  Compensation is no doubt relevant to an employment relationship.  What this provision does *not* say, however, is that a person providing labor without remuneration can never qualify as an employee.  Moreover, section 2775, subdivision (b)(2), expressly provides that the foregoing language does not displace existing definitions or extensions of coverage in the Labor Code or wage orders: it states that "[n]otwithstanding paragraph [(b)](1), any exceptions to the terms 'employee,' 'employer,' 'employ,' or 'independent contractor,' and any extensions of employer status or liability, that are expressly made by a provision of this code, . . . , or in an applicable order of the Industrial Welfare Commission, . . . , shall remain in effect for the purposes set forth therein." And section 2785 provides that "Section 2775 does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission and violations of this code relating to wage orders."  (§ 2785, subd. (a).)  We are therefore unpersuaded that section 2775 establishes a new prerequisite that, to qualify as an employee, an agreement for remuneration must exist.

Further support for our conclusion—that the lack of an agreement for the worker to be paid is not controlling—is found in section 1194, which expressly invalidates agreements to work for less than the minimum wage.  (See § 1194, subd. (a); see also *Martinez*, *supra*, 49 Cal.4th at p. 56.)  Recognizing that there may be some circumstances in which a worker who has agreed to work without compensation may nonetheless qualify as an employee is in keeping with section 1194's dictate that a covered worker may not waive the law's protections.  (See *Dynamex*, *supra,* 4 Cal.5th at p. 960.)

The purposes of our state's wage laws also do not support making an agreement for remuneration a threshold test for employee status in the circumstances here.  As provided in

section 90.5, subdivision (a), minimum labor standards must be enforced to ensure that employees do not work "for *employers that have not secured the payment of compensation.*" (Italics added.) Requiring an agreement for compensation in all circumstances could undermine those purposes by allowing the most vulnerable of workers to persist in positions of unpaid servitude.[9]

In sum, the question of remuneration is one relevant aspect in assessing employee status, but it is not a dispositive or threshold consideration.

Given that the trial court here deemed the existence of an agreement for compensation dispositive, the court understandably did not consider the evidence relevant to the controlling inquiry identified herein. Further, the trial court declined to rule on the parties' evidentiary objections which it deemed immaterial to its analysis. Under these circumstances, the trial court should have an opportunity in the first instance to

---

[9] For the reasons we have explained, the Salvation Army's reliance on Fair Employment and Housing Act (FEHA) cases applying a threshold remuneration test for employee status is unpersuasive. Further, as Spilman notes, FEHA relies on a common law test for employment, whereas (as discussed in the text) the wage law does not. (See *Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1626-1627.)

We recognize that it may be desirable for all the employment-related laws to have consistent understandings of the covered employment relationship. But each set of employment laws serves distinct purposes, and it is up to the Legislature to align the applicable statutory definitions if it wishes to do so. (See, e.g., *Talley v. County of Fresno* (2020) 51 Cal.App.5th 1060, 1082 [explaining that in 2014, after courts had held that volunteers and interns were not protected by FEHA, the Legislature amended FEHA to provide unpaid interns and volunteers some protection against discrimination without making them employees].)

apply the proper analysis and determine whether triable issues of material fact preclude summary judgment, resolving the parties' evidentiary objections as necessary.[10]

On remand, the trial court shall consider, for purposes of summary judgment, whether there are triable issues of fact as to (1) whether Spilman was a volunteer who freely agreed to work without pay, as opposed to an employee working in exchange for compensation; and (2) whether overall, the Salvation Army's use of the volunteer labor does not serve as a subterfuge to evade the wage laws.

## DISPOSITION

The judgment is vacated and the case is remanded for further proceedings consistent with our opinion.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.

*Justin Spilman et al. v. The Salvation Army* (A169279)

---

[10] We note that this opinion contains a summary of the facts for purposes of providing context for our legal discussion. Any characterization of the facts contained in this opinion is not intended to constrain the trial court in resolving the parties' evidentiary objections or in making factual findings on remand, nor is the court precluded from allowing the parties to submit additional evidence.

Superior Court of the City and County of San Francisco, No. CGC-21-591364, The Hon. Ethan P. Schulman, Judge.

Rose Bien Galvan & Grunfeld LLP, Lisa A. Ells, Michael L. Freedman, Gay C. Grunfeld, Benjamin Hattem and Mari Tanabe; Rukin Hyland & Riggin LLP, Jessica L. Riggin, for Plaintiffs and Appellants.

Impact Fund, Meredith Dixon, Lori E. Rifkin and Lindsay P. Nako; Disability Rights Education & Defense Fund, Jinny Kim and Ayesha E. Lewis, for Impact Fund, Disability Rights Education & Defense Fund, California Rural Legal Assistance Foundation, Disability Rights Advocates, Disability Rights California, Disability Rights Legal Center, Legal Aid at Work, Legal Services for Prisoners with Children, The Wage Justice Center and Worksafe as Amici Curiae on behalf of Plaintiffs and Appellants.

Littler Mendleson, P.C., Amelia A. McDermott, Jaime B. Laurent and Nicole Vongchanglor for Defendant and Respondent.